**ROBZEN'S, INC., Plaintiff,**

v.

**UNITED STATES of America, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants.**

Civ. No. 79–1477.

United States District Court,
M. D. Pennsylvania.

March 31, 1981.

Donald H. Brobst, Howard M. Levinson, Wilkes Barre, Pa., for plaintiff.

Hugh F. Mundy, Wilkes Barre, Pa., Robert J. Nolan, Asst. U. S. Atty., Scranton, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. FACTS

This case is before the court on cross-motions for summary judgment. Robzen's, Inc., claims the right to compensation for "moving and related expenses" incurred during a forced relocation from Wilkes Barre to Scranton pursuant to a condemnation of the company's real property in 1977. The principal defendant, the United States Department of Housing and Urban Development ("HUD"), argues that the complainant has already received all appropriate payments authorized under state and federal law. Resolution of the controversy requires a careful review of the facts.

Robzen's, a corporation engaged in the processing of meat products, has a history which dates back to 1938. For thirty-nine years, the plaintiff maintained its sole plant at 810–840 North Pennsylvania Avenue in Wilkes Barre. On August 16, 1973, the Wilkes Barre City Council adopted a proposal for redevelopment of designated areas in the municipality.[1] HUD subsequently approved this scheme. As a preliminary measure, the plan called for condemnation of private property located in the sections targeted for reconstruction. The Robzen's plant was within the zone set aside for rebuilding. Representatives of the plaintiff and the Wilkes Barre Redevelopment Authority attempted to negotiate a settlement of the condemnee's rights. Unfortunately, the parties could not reach an agreement.

In January 1975, the Authority filed an action in the Luzerne County Court of Common Pleas to formalize the condemnation. On September 10th of that year, the Board of View determined that the plaintiff was entitled to $661,728.00 in return for the property. The Authority appealed this finding to the Common Pleas Court. The parties eliminated the need for a final ruling on that particular issue in March of 1977, when Robzen's accepted $590,000.00 as satisfaction for all of its claims except those pertaining to moving expenses. The latter issue was deferred pending further negotiations with the Authority.[2]

The complainant's request for moving expenses fell into two categories. Initially, Robzen's received $25,000.00 as compensation for the cost of moving inventory to Scranton. There is no dispute as to the propriety of this payment. Second, the plaintiff also submitted an expanded list of moving expenses which included claims based on the need for substitute equipment, professional services, modification of the new facility, and other expense items. In all, the complainant sought $1,644,709.12. On February 22, 1979, the Authority rendered its final decision denying Robzen's any recovery for the costs outlined in the expanded list. Pursuant to federal regulations, the plaintiff then obtained a review of this decision from HUD. The latter agency slightly modified the Authority's

---

1. During the previous year, much of the city had been damaged by the Agnes Flood.

2. During February 1977, the complainant vacated its Wilkes Barre plant and began operations at 240 River Street in Scranton.

ruling. Specifically, the complainant was awarded $2,843.70 for advertising necessitated by the relocation and $180.24 for costs incidental to a move to another circuit operated by the Department of Agriculture. HUD, however, upheld all other aspects of the Authority's decision. Ultimately, Robzen's sought redress in this court.

The plaintiff's overall argument is concise. According to 42 U.S.C. § 4622(a), a provision of the Uniform Relocation Assistance Act ("URAA"):

> Whenever the acquisition of real property for a program or project undertaken by a Federal Agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall make a payment to any displaced person, upon proper application as approved by such agency head, for—
> (1) actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;
> (2) actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property as determined by the head of the agency; and
> (3) actual reasonable expenses in searching for a replacement business or farm.

All parties to this litigation agree that Robzen's is a "displaced person" eligible for compensation under this statute. *See Messer v. Virgin Islands Renewal Board*, 623 F.2d 303, 304 (3d Cir. 1980). The complainant contends that the items contained in the expanded list are authorized under § 4622(a) and applicable regulations.

HUD, conversely, insists that the plaintiff's rights resulting from the condemnation have been satisfied. As previously indicated, Robzen's received $590,000.00 for its property in Wilkes Barre. This sum was calculated according to the "Assembled Economic Unit Doctrine", a principle that requires the Commonwealth to include in eminent domain awards an allowance for

machinery, equipment, and fixtures ("MEF") which cannot be economically moved to a new situs. At oral argument, the parties agreed that the complainant had received payment for *all* of the MEF located in the Wilkes Barre plant. On this basis, the defendants propose that Robzen's entire business interest has been "extinguished" and the corporation has no right to "moving expenses," because there literally was nothing left to move to Scranton other than the inventory, for which compensation has already been made.

Both sides have moved for summary judgment. The defendants feel that their extinction argument can dispose of the entire case without further expansion of the record. Robzen's asks the court to recognize a right to recover with regard to broad categories of liability but admits that more evidence will be needed to set specific awards under each classification. Each motion will be granted in part. For reasons stated below, the court holds that the plaintiff may recover the following expenses: (1) licenses, permits, certifications, and professional services incidental to the move; (2) search expenses; and (3) modifications of the Scranton plant necessary to prepare the facility for operation. The issue of storage costs shall remain open. HUD's request for summary judgment is awarded in all other respects.

## II. JURISDICTION

■ Before discussing the merits of the case, the court must resolve a threshold argument involving jurisdiction. HUD claims that the sovereign immunity of the United States Government renders any claims against the federal defendant invalid. This contention misapprehends the true nature of the suit. The Administrative Procedure Act ("APA") generally permits judicial review of decisions rendered by federal agencies. *See* 5 U.S.C. §§ 701, et seq. Our Court of Appeals has held that the APA grants jurisdiction over suits that challenge HUD's implementation of the URAA. *Society Hill Civic Association v.*

*Harris,* 632 F.2d 1045, 1055–57 (3d Cir. 1980). In the current litigation the defendants have never questioned the fact that the plaintiff has exhausted the administrative procedures prerequisite to an action under §§ 701, et seq. Accordingly, HUD's challenge to the court's jurisdiction is rejected.[3]

The complaint states an alternative ground for jurisdiction *i. e.,* a direct cause of action based on the URAA. The soundness of this argument is uncertain. In *Beaird-Poulan Division of Emerson Electric Company v. Department of Highways, State of Louisiana,* 441 F.Supp. 866, 869–70 (W.D.La.1977), *aff'd,* 616 F.2d 255 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 383, 66 L.Ed.2d 234 (1980), the district court recognized such a claim.[4] The Court of Appeals for the Fifth Circuit summarily affirmed the ruling and the Supreme Court denied *certiorari.* Justice Rehnquist, however, dissented from the latter decision on the following rationale: "Nothing in the [URAA] gives displaced persons a direct cause of action ..., nor does respondent cite any evidence in the legislative history suggesting that such a cause of action was contemplated." 101 S.Ct. at 384–85. The Court of Appeals for the Third Circuit, moreover, has admonished district judges to be "chary" of implying statutory remedies broader than those expressly established by Congress. *United States v. City of Philadelphia,* 644 F.2d 187 at 192 (3d Cir. 1980). This court need not resolve the issue. At oral argument, counsel for the plaintiff stated that the scope of review permitted by the APA is adequate for presentation of the arguments that Robzen's shall offer in the instant suit. For this reason, there is no need to assess the validity of a complaint premised solely on the URAA. *Bell v. Wolfish,* 441 U.S. 520, 526–27 n. 6, 99 S.Ct. 1861, 1867 n.6, 60 L.Ed.2d 447 (1979); *Swank Refractories Company v. State Workmen's Insurance Fund,* Civil No. 79–1293, slip op. at 7 (M.D.Pa., March 20, 1980).

## III. ANALYTICAL FRAMEWORK

### A. The Uniform Relocation Assistance Act

◼ The overriding purpose of the URAA is standardization of the benefits available to individuals displaced by federal projects. *Alexander v. United States Department of Housing and Urban Development,* 441 U.S. 39, 49, 99 S.Ct. 1572, 1580, 60 L.Ed.2d 28 (1979). The legislative history indicates that the drafters of the Act considered previous methods for compensating condemnees seriously inadequate. The official report issued by the House Public Works Committee stated:

... As the thrust of Federal and federally assisted programs ... shifted from rural to urban situations, it became increasingly apparent that the application of traditional concepts of valuation and eminent domain resulted in inequitable treatment for large numbers of people displaced by public action. When applied to densely populated urban areas, with already limited housing, the result can be catastrophic for those whose homes or businesses must give way to public needs. The result far too often has been that a few citizens have been called upon to bear the burden of meeting public needs.

[1970] U.S.Code Cong. & Admin.News 5850, 5851. To remedy this situation, Congress passed the URAA which establishes uni-

---

**3.** In *Society Hill,* the Court of Appeals noted that the APA denies judicial review in only two instances, *viz.,* (1) when another statute precludes such scrutiny and (2) when the matter is left entirely to agency discretion. The majority noted that the first exception is not applicable to the URAA. With regard to the second category, the Robzen's argument is premised on the allegation that HUD has transgressed binding provisions of both the Relocation Act and the agency's own regulations. *Society Hill* ruled that such an assertion supports a valid claim under the APA. 632 F.2d at 1055–57.

**4.** The plaintiff in *Beaird-Poulan* had not adequately exhausted the administrative remedies necessary for judicial review under the APA and, therefore, required another ground for subject matter jurisdiction.

form rights for all eligible displacees.[5] *See also* Annot., 33 ALR Fed. 9, 28–36 (1977).

The instant case turns on § 4622(a) of the Act. As previously quoted, this provision states that a condemnee may qualify for three types of compensation: (1) "reasonable expenses in moving," (2) "direct losses of tangible personal property," and (3) "reasonable expenses in searching for a replacement farm or business." Congress, moreover, has authorized the heads of HUD and other federal agencies to promulgate regulations for the administration of the URAA. 42 U.S.C. § 4633. These regulations are binding on the defendants. *Society Hill Civic Association v. Harris*, 632 F.2d at 1056–57.[6] In assessing Robzen's claim for relief, this court must construe § 4622(a) and its companion regulations.

At the outset, it is essential to understand the proper relationship between compensation established by the URAA and that obtainable under the Commonwealth's eminent domain laws. The Relocation Act supplements state procedures by setting a minimum standard of recovery available to all eligible displacees. If the eminent domain laws of a particular state do not provide sufficient payments to satisfy this standard, then the URAA authorizes federal funds to make up the difference. *Auraria Businessmen Against Confiscation, Inc. v. Denver Urban Renewal Authority*, 183 Colo. 441, 517 P.2d 845 (1974) offers a good illustration of this principle. There, the Colorado Supreme Court held that, as a matter of state law, a condemnee's goodwill and lost profits were not compensable under eminent domain. In a footnote, however, the opinion noted that the plaintiff might be able to achieve at least partial recovery for these expenses by invoking the URAA. 517 P.2d at 848 n.2.

Congress, nevertheless, also decided that federal expenditures should not provide displacees with double recovery. Hence, the Relocation Act denies compensation for any item already covered by state law, even if the terms of the URAA would otherwise provide payment. According to 42 U.S.C. § 4631(b):

No payment or assistance under Section 4630 [which includes the items listed in § 4622(a)] or 4655 of this title shall be required or included as a program or project cost under this section, if the displaced person receives a payment required by the State law of eminent domain which is determined by such Federal agency head to have substantially the same purpose and effect as such payment under this section, and to be part of the cost of the program or project for which the Federal financial assistance is available.

The legislative history of this provision states:

Subsection (b) provides that no relocation payment or assistance is to be provided and no Federal financial assistance will be permitted if an equivalent payment is made to the displaced person under the State law of eminent domain.

[1970] U.S.Code Cong. & Admin.News at 5866. HUD has codified the prohibition against double recovery in its regulations. *See* 42 CFR § 42.7 (1980); 42 CFR § 42.40 (1977).

In light of the Congressional scheme underlying the URAA, the proper analytical framework for assessing Robzen's claims is relatively straightforward. Initially, the court must examine each item for which recovery is demanded by the plaintiff. If the request does not qualify for coverage under the Relocation Act, then the award must be denied automatically. In the event that the URAA does apply, then a further inquiry is necessary to determine if the item has been compensated under state

---

**5.** The Public Works Committee noted that prior to the URAA, various federal statutes provided relief for individuals whose land was condemned under specific programs. *See, e. g.,* the Federal Highway Act, 23 U.S.C. § 133. The URAA was designed to consolidate these rights and eliminate discrepancies among different laws.

**6.** *See also Yearsley v. Scranton Housing Authority*, 487 F.Supp. 784, 788 (M.D.Pa.1979) ("A H.U.D. regulation, validly issued, possesses legal effect comparable to that of a statute.").

law. Robzen's shall receive payments for all items sanctioned under the Relocation Act which have not been satisfied by the Commonwealth.

## B. The Assembled Economic Unit Doctrine

HUD's "extinction" argument is designed to dispose of the plaintiff's entire case. Thus, the issue must be resolved before the court applies the two-step test detailed in the previous subsection. In *Singer v. Oil City Redevelopment Authority*, 437 Pa. 55, 261 A.2d 594 (1970), the Pennsylvania Supreme Court authoritatively established the "Assembled Economic Unit Doctrine." The defendants' extinction rationale hinges on an understanding of this concept.

*Singer* concerned the condemnation of a grocery store. The complainant sued to recover the value of machinery that had been used for operation of the business. On behalf of the majority, Justice (later Chief Justice) Eagen set forth a number of important principles.[7] First, "items of machinery, equipment and fixtures *not removable* from the condemned structure are to be considered a part of the realty taken by the condemnor." *Id.* at 66, 261 A.2d 594 (emphasis in original). Indeed, the right to recover such apparatus is explicitly recognized in the Eminent Domain Code. 26 P.S. § 1–603(3). Second, Justice Eagen outlined two instances in which MEF physically removable from the taken premises would be compensable. If, for example, so much of the apparatus were attached to the condemned property that the removable portion could not support a viable business operation, the owner would deserve compensation for "*all* machinery, equipment and fixtures ... vital to the economic unit." *Id.* at 66–67, 261 A.2d 594 (emphasis in original).[8] Secondly, even if all or most of the MEF could be moved, total compensation would be appropriate in instances where the condemned business required "a unique building for its operation, such that no other building within a reasonable distance [was] adaptable to the functioning of the business." *Id.* at 67, 261 A.2d 594.[9] Justice Eagen explained the rationale for these principles thusly:

> ... To hold otherwise would leave condemnee only with scattered pieces of second-hand machinery, equipment and fixtures, most probably significantly depreciated in value when severed from the economic unit. Since the condemnee cannot maintain his economic position by moving to a new location, the statutory scheme will not grant him "just compensation" without the applicability of the Assembled Economic Unit Doctrine.

*Id.* at 67, 261 A.2d 594.[10]

■ A review of *Singer* and its progeny undermines HUD's extinction theory. In the proper circumstances, the Assembled Economic Unit Doctrine will increase a condemnee's eminent domain award by adding compensation for machinery, equipment, and fixtures to the payment the owner would normally receive for a taking of real property.[11] Nothing in the principle, how-

---

7. Two justices concurred without opinion.

8. The facts of *Commonwealth, Department of Transportation v. Seltzer*, 18 Pa.Cmwlth. 127, 334 A.2d 834, 837–39 (1975) exemplify this type of situation. The case involved the taking of a coal processing operation. The breaker and most of the heavy equipment passed as part of the realty, because they could not be moved. The Commonwealth Court also ruled that the condemnee's trucks, bulldozer, and other property at the site could be compensable on the ground that, by themselves, they would not constitute a coal processing business.

9. This latter corollary seems to have triggered the Assembled Economic Unit Doctrine in the instant suit. Much of Robzen's MEF was movable; most of it was eventually sold at an auction. Yet the closest location of a reasonable facility, 240 River Street in Scranton, was too far away for the apparatus to be transferred economically.

10. The *Singer* court denied the former grocery store owner recovery for his MEF. The record demonstrated that the plaintiff failed to qualify under any of the provisions established by the Assembled Economic Unit Doctrine.

11. *See, e. g., Commonwealth v. Lafferty*, 419 A.3d 518, 520 (Pa.Super.1980) ("... condemnee is entitled to compensation for the value of personal property such as machinery...."); *Redevelopment Authority of the City of Philadelphia v. Associated Retail Stores, Inc.*, 47 Pa.Cmwlth. 268, 408 A.2d 181, 182

ever, states that remuneration "extinguishes" a displacee's entire business interest. Indeed, both HUD and the Authority implicitly recognized that Robzen's would continue operations when they authorized money for costs such as the transportation of inventory. It is true that *Singer* forecloses subsidization for moving expenses that involve MEF considered part of the realty under the Assembled Economic Unit Doctrine. 437 Pa. at 70, 261 A.2d 594. Yet this fact does not support HUD's conclusion that compensation for machinery, equipment, and fixtures cuts off a condemnee's right to collect payment for other types of expenses requested by the plaintiff, *e. g.*, physical changes necessary at the Scranton facility.

■ Even more importantly, this court would not have accepted the defendants' argument even if HUD's interpretation of *Singer* were correct. As already explained, the URAA establishes a scheme by which the Federal Government has set minimum levels of recovery for "displaced persons," such as Robzen's. Under the Supremacy Clause, state law may not frustrate this Congressional policy. *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 583, 99 S.Ct. 802, 809, 59 L.Ed.2d 1 (1979). Thus, the plaintiff's right to obtain the minimum payment authorized by the URAA and not supplied by eminent domain would stand intact even if the Wilkes Barre plant had been "extinguished" under the Assembled Economic Unit Doctrine.[12]

## IV. SPECIFIC REQUESTS

At this point, it is appropriate to consider each of Robzen's requests for "moving expenses" individually. As set forth in Part III–A of this Memorandum, the court shall decide if: (1) the item qualifies for coverage under the URAA and (2) compensation has already been supplied by the Commonwealth. The HUD regulations supplementing the URAA have been modified on several occasions. The briefs submitted in this case contain some discussion concerning which set governs the litigation. During the oral argument, the parties resolved the question by agreeing that the regulations in effect between March 31, 1975 and April 25,

(1979) ("The Assembled Economic Unit Doctrine is the judicial test for determining whether machinery, equipment and fixtures constitute part of an assembled economic unit and therefore part of the condemned realty...."); *Redevelopment Authority of the City of Philadelphia v. Driscoll,* 45 Pa.Cmwlth. 202, 405 A.2d 975, 978 (1979) ("Essentially, where the relocation of a business as an intact economic unit cannot take place, the [Assembled Economic Unit] Doctrine may be applied so that the MEF associated with the business may be valued along with the condemned property."). *See also Gottus v. County Redevelopment Authority,* 425 Pa. 584, 588–89, 229 A.2d 869 (1967).

12. The court realizes that in rejecting HUD's "extinction" contention, this ruling refuses to adopt an agency's construction of its own statute and regulations. In such instances, the judiciary normally grants the Government considerable deference. *Environmental Protection Agency v. National Crushed Stone Association,* —— U.S. ——, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980); *Ford Motor Credit Company v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). Nevertheless, two factors in the present case significantly vitiate the degree of deference that is appropriate. First, HUD's argument turns heavily on interpretation of state law, an area of jurisprudence which does not fall within the agency's special zone of expertise. *Cf. Board of Governors of the Federal Reserve System v. Investment Company Institute,* —— U.S. ——, —— –—— & n.21, 101 S.Ct. 973, 980–982 & n.21, 67 L.Ed.2d 36 & n.21 (1981). Second, the United States conceded at oral argument that the federal defendant has never offered an explanation of its administrative determination other than its letter of July 16, 1979, in which the requests contained in the expanded list of moving expenses were denied. *See* Exhibit B, Document 15 of the Record. The rationale of this document is conclusory. The absence of a detailed explanation of the agency's finding also diminishes the extent to which the court should defer. *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 117–19, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978); *Adamo Wrecking Company v. United States,* 434 U.S. 275, 287–88, 98 S.Ct. 566, 573–75, 54 L.Ed.2d 538 (1978). After viewing the relevant authorities, the court must conclude that the agency's position is incorrect. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212–14, 96 S.Ct. 1375, 1390–91, 47 L.Ed.2d 668 (1976).

1977 control because the move occurred in February of the latter year.[13]

### A. Licenses, Permits, Certifications, and Professional Services

According to 24 CFR § 42.65(3) and (4), a displaced business may recover for:

> (3) The cost of any license, permit or certification required by a displaced business concern to the extent such cost is necessary to the reestablishment of its operation at a new location;
>
> (4) The cost of any professional services necessary to the planning, preparation for or accomplishment of a move by a displaced business concern, or its reestablishment at a new location, including, but not limited to, architects', attorneys' or engineers' fees, or consultants' charges
>
> . . . .

The plaintiff contends that it was required to procure licenses and other forms of legal authorization before commencement of operations in Scranton. Robzen's, moreover, states that expert assistance was engaged in planning and preparing the move. Compensation is sought with regard to the expenses that resulted from these activities.

■ The defendants have not challenged the fact that the plaintiff incurred such costs. Rather, their argument is essentially legal, *viz.*, that no compensation is appropriate, because the complainant's Wilkes Barre plant was extinguished under the Assembled Economic Unit Doctrine. The court has already disposed of this proposition. As a "displaced person," Robzen's is eligible for payments under 24 CFR § 42.65(3) and (4). Also, the record does not even vaguely suggest that the plaintiff received payments from the Commonwealth for these expenses. Therefore, the complainant may recover for any costs actually incurred, which fall within the zone of compensation created by subsections (3) and (4).

### B. Physical Changes at the Scranton Plant

Robzen's alleges that the structure at the new facility needed $105,467.33 worth of work before the processing of meat and livestock could begin. Remuneration for this expense is allowed by 24 CFR § 42.65(b)(2)(i) which, subject to a maximum award of $100,000.00, compensates for:

> Any addition, improvement, alteration or other physical change in or to any structure or its premises in connection with the reassembling, reconnection or reinstallation of machinery, equipment, or other personal property, or otherwise required to render such structure, premises, or equipment suitable for a displaced business . . .

The complainant asserts that the improvements required by the Scranton plant qualify for recovery to the fullest extent sanctioned by the URAA's regulations.

■ The language of subsection (b)(2)(i) permits restitution for two types of work at the new facility. The first concerns costs "in connection with the *re*assembling, *re*connection or *re*installation of machinery or other personal property" (emphasis added). This provision clearly concerns expenses involved in moving MEF from the condemned premises to a new plant. Robzen's cannot recover under this clause, because it moved no "machinery or other personal property" to Scranton. In reality, the complainant seeks compensation for changes necessitated by the installation of new equipment and other such *de novo* improvements. This work, of course, is not necessarily related to the transfer of personal property. The second provision in subsection (b)(2)(i) provides payment for costs "otherwise required to render such structure, premises, or equipment suitable for a displaced business." If this clause is to have any meaning, it must relate to expenses unconnected with MEF transported from the former facility. Moreover, the language of the second clause is broad and covers a wide variety of work necessary to render the new structure ready for business. Thus, Robzen's has the right to collect under this subsection if it can demonstrate that: (1) appropriate costs

---

**13.** The current regulations differ from the 1977 provisions in several important respects. *See* 24 CFR § 42.1, et seq. (1980). This Memorandum offers no opinion concerning the validity of the Robzen's claim under the present rules.

were actually incurred and (2) the Commonwealth has not provided compensation for these expenses.

## C. Search Expenses

■ This issue is straightforward. The applicable HUD regulation declares that:

> A displaced person who satisfies the pertinent eligibility requirements of § 42.65 with respect to actual reasonable moving expenses, shall be eligible for a payment in an amount not to exceed $500.00, in searching for a replacement business or farm, including expenses incurred for (a) transportation; (b) meals and lodging away from home; (c) time spent in searching, based upon the hourly wage rate or the salary or earnings of the displaced person or his representative, but not to exceed $10.00 per hour; and (d) fees paid to a real estate agent or broker to locate a replacement business or farm.

24 CFR § 42.75. Since the complainant is a "displaced person" eligible for treatment under 24 CFR § 42.65, the case qualifies for a recovery under this provision.[14] Furthermore, the defendants have never contended that any portion of the eminent domain settlement paid for such costs. Accordingly, Robzen's may recover under § 42.75 if it can establish that such expenditures were made.

## D. Expenses Related to "Reassembling, Reconnecting and Reinstalling" Equipment in Scranton

The complainant also seeks reimbursement for installation of MEF at the new premises. Recovery may be possible under § 42.65(b)(2)(i) to the extent that this work involves changes in the plant structure. The plaintiff, however, desires remuneration beyond the scope of the latter subsection. Robzen's cites 24 CFR § 42.65(b)(1) which provides payments for:

> Disconnecting, dismantling, removing, reassembling, reconnecting and reinstalling machinery, equipment or other personal property (including goods and inventory kept for sale) not acquired by the state agency . . . .

In the view of the complainant, this enactment justifies compensation for all expenses incurred in setting up the equipment at the Scranton site.

■ The wording of subsection (b)(1) is quite similar to that contained in (b)(2)(i). *See* Part IV–B of this Memorandum. As in the latter case, terms such as "reassembling," "reconnecting," and "reinstalling" demonstrate a clear intention on the part of the regulatory drafters to limit remuneration to instances in which the plaintiff moved MEF from the old to the new premises. Subsection (b)(1), however, does not have the "or otherwise" language which authorized Robzen's claim under (b)(2)(i). Even the most liberal construction that the court could give this regulation would preclude recovery.

■ Robzen's maintains that limitation of recovery to instances in which the condemnee has moved personal property from the former plant would be "superficial." The federal judiciary, nonetheless, must interpret statutes and regulations according to the intent of the authors and not with a view to selecting a more desirable public policy. *Potomac Electric Power Company v. Director, Office of Workers' Compensation Programs,* —— U.S. ——, ——, 101 S.Ct. 509, 517–18, 66 L.Ed.2d 446 (1980); *Vega v. United States Parole Commission,* Civil No. 80–0525, slip op. at 1 (M.D.Pa., January 13, 1981). Section 42.65(b)(1) simply denies the plaintiff the right to collect for the type of costs incurred. Hence, any recovery under the provision is precluded.[15]

## E. Substitute Equipment

Another area in which Robzen's claims the right to recover pertains to 24 CFR § 42.65(b)(5) which provides:

---

**14.** *See* Subparts A and B of this Part of the Memorandum which recognize the plaintiff's right to consideration under 24 CFR § 42.-65(2)(i), (3) and (4).

**15.** Robzen's has never contended that any of the regulations that supplement the URAA are unconstitutional for want of a rational basis. Consequently, the court need not consider the legal validity of subsection (b)(1). It should be

Where an item of personal property which is used in connection with any business or farm operation is not moved but is replaced with a comparable item, reimbursement in an amount not to exceed (i) the replacement cost, minus any proceeds received from its sale, or (ii) the estimated cost of moving, whichever is less.

The plaintiff reasons that since all of the MEF at the Wilkes Barre operation passed to the Commonwealth under the Assembled Economic Unit Doctrine, subsection (b)(5) applies to the instant situation. In the opinion of the complainant, the amount received for the condemned apparatus should be subtracted from the price paid for the equipment purchased for use in the Scranton plant in order to calculate an appropriate award. This argument is unpersuasive for two reasons.

■■■■ A federal district court may not construe an executive agency's regulations to have a scope in excess of that permitted by the department's enabling legislation. *Ernst & Ernst v. Hochfelder*, 425 U.S. at 212–14, 96 S.Ct. at 1375. Congress intended that compensation for "substitute equipment" under the URAA not surpass the value of apparatus condemned with the former plant. As the House Public Works Report on the statute stated:

A person displaced from a business or farm operation may be compensated for actual direct property losses, whether he discontinues or reestablishes his operation. However, the maximum amount of any such payment may not exceed the reasonable expenses that would have been required to relocate the property, and *in the case of heavy machinery, equipment, or other property involving substantial sums, also should not exceed the in-place value of the property.*

[1970] U.S.Code Cong. & Admin.News at 5856 (emphasis added). Robzen's has al-

ready been paid for the "in-place value" of the MEF left behind at Wilkes Barre. An additional award would frustrate the Congressional limit on recoveries.

Furthermore, the plaintiff could not recover for "substitute equipment" even if the regulations were read without reference to the general thrust of the URAA. As previously quoted, § 42.64(b)(5) limits recovery to replacements of "personal property." The latter term is defined in the following manner:

... (1) Tangible property which is situated on the real property vacated or to be vacated by a displaced person and which is considered personal property and is noncompensable (other than for moving expenses) under the State law of eminent domain.... In the case of an owner of real property, the determination as to whether an item of property is personal or real shall take due consideration of how it is identified in the acquisition appraisals and the closing or settlement statement with respect to the real property acquisitions.

24 CFR § 42.20(m). Under the *Singer* doctrine, the condemned MEF was realty, not personal property. Additionally, the Pennsylvania law of eminent domain provided that the Wilkes Barre equipment was "compensable." Thus, Robzen's fails to qualify for an award.

## F. Weight Loss of Cattle

The plaintiff's claim in this regard is somewhat involved. Livestock reach the slaughterhouse by rail. The complainant's market is allegedly closer to Wilkes Barre than Scranton. Consequently, Robzen's argues that in the future its cattle will be required to spend more time in the trains *en route* to delivery. While embarked, livestock tend to lose weight. The plaintiff desires compensation for the economic injury that will supposedly result from this diminution in bulk. Indeed, the complainant asks that the defendants pay for all the

noted, however, that nothing in the record indicates that the complainant could have prevailed on such an argument had the theory been proposed. *See United States Railroad*

*Retirement Board v. Fritz*, —— U.S. ——, —— ——, 101 S.Ct. 453, 459–61, 66 L.Ed.2d 368 (1980).

estimated weight loss that will occur during the projected life of the youngest stockholder.[16] Robzen's bases this request on 24 CFR § 42.70(a) which provides funds for "actual direct losses of personal property." The regulation establishes that:

> ... A State agency shall make a payment to a displaced person who satisfies the eligibility requirements of § 42.65, and this section for actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, in an amount determined by the State agency in accordance with the provisions of this section.

■ The definition of "actual direct losses of personal property" is much narrower than that proferred by the complainant. The very language of § 4622(a)(2) states that compensation for all direct losses is "not to exceed an amount equal to the reasonable expenses that would have been required to *relocate such property.*" (emphasis added). In discussing the concept, the House Public Works Committee explained that:

> Payments for direct losses of property are allowed where a person who is displaced from his place of business or farm operation is entitled to relocate his property, but does not do so. *Typical items in the case of a business include equipment, machinery, or fixtures which are no longer required, where the business or farm operation is to be discontinued or the property is not suitable for use at the new location.* The relocation of old trade fixtures, machinery, or equipment frequently is impractical or uneconomical, if not impossible, and could be a deterrent to the successful re-establishment of a business.

[1970] U.S.Code Cong. & Admin.News at 5856 (emphasis added). This language demonstrates that the Relocation Act's compensation for "actual direct losses" is essentially a federal version of the Assembled Economic Unit Doctrine which pays a displacee for MEF that could not be severed from the condemned premises. Nothing in the legislative history supports a broader reading of

the statute. The method for calculating "actual direct losses" lends additional support to this conclusion. According to 24 CFR § 42.70(b):

> ... Actual direct loss of property shall be determined on the basis of the lesser of:
>
> (1) Fair market value of the property for continued use at its location prior to displacement plus the costs of a bona fide effort to sell such property; or
>
> (2) Estimated reasonable costs of moving such property, plus the costs of a bona fide effort to sell such property.

This subsection does not authorize recovery for future injury, such as the predicted weight loss of Robzen's cattle. The URAA does not provide compensation for damages of so speculative a nature. Rather, the regulation only concerns personal property left at the former plant. Under the *Singer* rule, the plaintiff has already received full compensation for such expenses.

**G. Storage Costs**

■ According to 24 CFR § 42.65(a)(3), a condemnee may recover for costs resulting from:

> Such storage of personal property, for a period generally not to exceed 12 months, as the State agency determines to be necessary in connection with relocation. . . .

This issue has not been sufficiently developed for a final ruling. The record is unsettled as to the nature of the storage expenses presently under review or the basis for the Authority's decision to withhold an award. Since the material questions of fact are not resolved, both sides shall be denied summary judgment. *Adickes v. S. H. Kress & Company,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

**V. CONCLUSION**

This Memorandum shall address two final points. The first pertains to HUD's remaining contentions. The federal defendant feels that Robzen's somehow delayed in pursuing many of its arguments when the condemnation was before the Luzerne

---

**16.** The plaintiff asserts that appropriate compensation would amount to $767,537.00.

.. 
**240**

County Court of Common Pleas. On this basis, HUD insists that any relief should be barred by estoppel or the effect of the eminent domain settlement. This proposition is unpersuasive. The pertinent records demonstrate that the plaintiff properly preserved its right to recover additional moving expenses.

Finally, the court shall summarize this ruling. The plaintiff is granted summary judgment to the extent that it may qualify for compensation under the following categories: (1) licenses and other forms of legal authorization necessary for conducting operations in Scranton, (2) search expenses, and (3) physical changes in the structure of the Scranton plant. The actual amount of recovery for each of these items, however, has yet to be decided. The plaintiff must establish its expenses in these matters before any award will be permitted. Neither side has prevailed on the question of storage costs, and that controversy remains extant. Lastly, the defendants are awarded summary judgment with regard to all other issues. The court shall retain jurisdiction over this litigation pending resolution of the remaining matters.