Edward M. and Diane F. STROGOFF, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 522–83T.

United States Claims Court.

Aug. 12, 1986.

Alan D. Rose, Boston, Mass., for plaintiffs.

Betty N. Ferber, Washington, D.C., with whom were Asst. Atty. Gen. Glenn L. Archer, Mildred L. Seidman, and Gerald B. Leedom, for defendant.

## OPINION

BRUGGINK, Judge.

This is an action for the recovery of federal income taxes. Resolution turns on the interpretation and application of a provision of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub.Law No. 91–646, 84 Stat. 1895, 42 U.S.C. §§ 4601–4655 (1982) ("Relocation Act"). At issue is whether the proceeds of a private sale of personal property pursuant to the Relocation Act are to be treated as income to the taxpayers. If answered negatively, there arises a subsidiary issue of whether the taxpayers can deduct from gross receipts the cost of the goods sold.

Pending before the court are the parties' cross-motions for summary judgment. The court has reviewed the pleadings and sub-

missions[1] and has heard the argument of the parties. For the reasons set out herein, the court concludes that there is no genuine issue as to any material fact, and that defendant is entitled to judgment as a matter of law.

## BACKGROUND

The Relocation Act provides a mechanism for the uniform and equitable treatment of persons displaced as a result of federal programs. It is intended, among other purposes, to compensate business owners for losses and expenses associated with the condemnation of the real property on which their businesses are operated.

Plaintiffs are Edward and Diane Strogoff and their daughters, Heather and Holly Strogoff, who in 1977 were minors. Edward Strogoff was the sole proprietor of Edward M. Strogoff Company ("EMSCO"). Heather and Holly were equal owners of Overseas Steel Trading Corporation ("Overseas"), a Subchapter S corporation. Both companies were engaged in the scrap metal business in Chelsea, Massachusetts. The property on which these businesses were conducted was in an area designated as an urban renewal project by the Chelsea Redevelopment Authority ("CRA"), a political subdivision of the Commonwealth of Massachusetts. This urban renewal project received federal funding through the Department of Housing and Urban Development ("HUD"). In accordance with the project plan, CRA took the property on which the scrap metal businesses were conducted through eminent domain proceedings on January 14, 1976.

Under the scheme created by the act, a dislocated business may either relocate or discontinue operations. In either event, reimbursement is based in part on "actual direct losses of tangible personal property as a result of moving or discontinuing a business ... but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property." 42 U.S.C. § 4622.

The Relocation Act authorizes the head of each federal agency to "establish such regulations and procedures as he may determine to be necessary to assure ... the payments and assistance authorized by this chapter." 42 U.S.C. § 4633. The HUD regulations relevant to the tax year in question are contained in 24 C.F.R. Part 42 (1975), and explained in HUD Handbook 1371.1 Rev., Relocation Policies and Procedures (1975) ("Relocation Handbook").

Section 42.70 of the regulations provides that the relocation payment for actual direct loss of tangible personal property is the lesser of—

> (1) Fair market value of the property for continued use at its location prior to displacement plus the costs of a bona fide effort to sell such property; or

> (2) Estimated reasonable costs of moving such property, plus the costs of a bona fide effort to sell such property.

It is further required that "[i]n every case [where a claim is made for actual direct loss of tangible personal property] a bona fide effort to sell such property shall first be made." 24 C.F.R. § 42.70. The proceeds received from the sale are then applied against the fair market value to determine the amount of the business owner's "actual direct loss." This in turn affects whether fair market value or moving cost is the lesser amount.

In the case at bar, plaintiffs could not obtain a license to continue operating a scrap metal business. Consequently, they chose to liquidate their operations and apply for actual direct losses of tangible personal property.

In accordance with the requirements of the HUD regulations, R. Thomas Gear Associates ("Gear") prepared an appraisal of the tangible personal property. CRA and HUD agreed that the direct loss payment should be based on an estimate of the total tonnage agreed upon among CRA, Edward

---

**1.** Plaintiffs' Motion for Leave To File Supplemental Affidavit is granted, and the affidavit has been considered.

Strogoff and Gear. The fair market values set for EMSCO's and Overseas' scrap metal inventory as part of continuing businesses were $528,675 and $66,000.00 respectively. CRA also solicited move estimates from three companies. The low estimates were $270,297.00 for EMSCO and $37,000 for Overseas.

Following the submission of these figures to CRA, it sent Edward Strogoff a letter dated April 1, 1977, outlining the formula to be used in determining the relocation payments:

The appraisal for Overseas Trading Corporation is $66,000.00 and the low move estimate is $37,000.00. The net proceeds from the sale of Overseas Trading personal property will be deducted from the appraisal and the balance compared with the low move estimate. The lower of the two figures will be this Authority's relocation payment to Overseas Trading.

The appraisal for Edward M. Strogoff is $528,675.00 and the low move estimate is $270,297.00. The net proceeds from the sale of Edward M. Strogoff personal property will be deducted from the appraisal and the balance compared with the low move estimate. The lower of the two figures will be this Authority's relocation payment to Edward M. Strogoff.

Gear then conducted a sale of EMSCO's and Overseas' scrap metal inventory during the spring of 1977. The sales proceeds of $251,625.88 and $27,405.64, respectively, were paid directly to the businesses by buyers at the sale. EMSCO and Overseas paid Gear commissions of $25,162.59 and $2,740.56, which were later reimbursed to the companies by CRA.

On May 2, 1977, CRA made a payment to Overseas of $39,740.56. On July 27, 1977, it paid $295,459.59 to EMSCO. The payments were determined by taking the lower of the fair market value less the proceeds from the sales, as compared to the low move estimate, and then adding the cost of the sales. In both cases the move estimates were the lower figure. Therefore, EMSCO received $295,459.59, which con-

sisted of $270,297.00, the low move estimate, plus $25,162.59, the commission paid to Gear. Overseas received $39,740.56, which consisted of $37,000.00, the low move estimate, and the $2,740.56 commission. In addition, on October 14, 1977, the CRA made a relocation payment of $9,612.75 to EMSCO for legal expenses involved in the sale. The two payments received by EMSCO totalled $305,072.34.

On their joint federal income tax return for 1977, Edward M. and Diane F. Strogoff did not include in gross income either the payment of $295,459.59 or the payment of $9,612.75 received from CRA by EMSCO. Nor did the Strogoffs include in gross income the $251,625.88 in proceeds EMSCO received from private purchasers of its inventory. Nonetheless, on Schedule C of their return, they took a loss for the cost of goods sold in the amount of $127,500.00.

The Relocation Act provides at section 216 that "no payment received under this subchapter shall be considered as income for the purposes of the Internal Revenue Code of 1954." 42 U.S.C. § 4636 ("section 216"). Before the sale, the plaintiffs attempted to determine from CRA officials whether the proceeds from sales to private parties would fall under that provision. Plaintiffs were assured by CRA employees that such proceeds were excludable from gross income, and were told that this was based on representations made, in turn, by HUD officials.

Despite CRA's earlier representations, the Internal Revenue Service ("Service") determined that the $251,625.88 EMSCO realized from the sales was taxable. A tax of $95,188.66 plus interest of $23,764.57 was assessed against Edward Strogoff as sole proprietor of EMSCO. Likewise, the $27,405.64 proceeds from the sale of Overseas' inventory were determined by the Service to be taxable. A tax of $2,747.00 with interest of $687.62 was assessed against both Heather and Holly Strogoff.

Plaintiffs Edward M. and Diane F. Strogoff seek $118,953.23 as overpayment of federal income tax for calendar year 1977.

Plaintiffs Heather and Holly Strogoff seek $3,434.62 each.

## THE ISSUE

The issue can be simply framed: Does the exclusion from income of a "payment received under this subchapter" extend to proceeds from private sales conducted pursuant to the regulatory scheme established to implement the act? The defendant argues that the term "payment" refers only to those types of payments specifically described in preceding sections of the Relocation Act, which are limited to payments from a federal agency. The plaintiffs counter that tax-free payments include all funds received, regardless of source, and that therefore proceeds of the sales were improperly included as income.

Plaintiffs advance three major arguments in support of their construction. First, they contend that the omission in section 216 of a reference to the source of the payments was deliberate, and shows an intent in Congress that section 216 should sweep in monies received from any source in connection with the operation of the Relocation Act. Plaintiffs propose that "Congress, if it had wished to limit the application of § 216 to payments made directly by the government, could have used language specifically referring to payments made by the federal agency as it did in these other sections." Plaintiffs' Opposition to Motion for Summary Judgment at 10 ("Plaintiffs' Opposition"). Plaintiffs argue that since the sale was conducted pursuant to the requirements and procedures implemented by HUD, the payments were "received under" subchapter II of the Relocation Act.[2]

Next plaintiffs argue that their construction is more in line with the general remedial purpose of the statute, which they say is to eliminate inconsistent and inequitable treatment of persons displaced by the federal government. Finally, plaintiffs argue that the government is estopped to assert that the proceeds of the sales are income.

## DISCUSSION

Section 216 is not self-contained. Nor does the term "payment" stand alone in that section. Rather, the statute specifies that the only payment to be excluded from income is one "received under" the relocation subchapter. Thus, on its face, section 216 draws meaning by reference to "payments received" under other sections of the act. Any inquiry into the matter at issue, therefore, is not without reference points, and the court must begin its analysis with a review of those other sections of that subchapter.

The term "payment" or "payments" appears in 9 of the 21 sections within the relocation subchapter. An examination of the 34 uses outside of section 216 shows that "payment" is used in a number of different ways, but each relates specifically to monies paid by the federal or state governments. For example:

Section 202(a)—"the head of such agency shall make a payment."

Section 202(b)—refers to payments under 202(a), and then authorizes payments for a moving expense allowance, as determined by the "head of the Federal agency."

Section 202(c)—refers to payments under 202(a), and then to a "fixed payment in an amount equal to the average annual net earnings of the business," after a preliminary determination of eligibility by "the head of the Federal agency."

Section 203—"the head of the Federal agency shall make an additional payment."

---

2. Plaintiffs support their argument in part with an analogy to § 1033 of the Internal Revenue Code, which provides for the exclusion of gain when property is involuntarily sold as a result of forced dislocation. It states that upon conversion into property "similar or related in service or use to the property so converted, no gain shall be recognized." 26 U.S.C. § 1033 (1986).

This code section simply allows the gain to be postponed until the taxpayer sells replacement property voluntarily. The defendant is correct in noting that the § 1033 cases cited by plaintiffs are of no avail in a situation, as here, in which a permanent exclusion of sales proceeds from income is sought, rather than a deferral of recognition.

Section 204—"the head of the Federal agency shall make a payment."

Section 207—"unless such State agency has made all payments."

Section 209—"the Washington Metropolitan Area Transit Authority ... shall make all relocation payments."

Section 210—relates to "payments ... under sections 202, 203, and 204 of this title."

Section 211—"The cost to a State agency of providing payments"; "payments or assistance by such State agency."

Section 213—"payments and assistance authorized by this Act."

Then follows section 216: "No payment received under this subchapter shall be considered as income...."

When considered in this context, as the statute itself requires, the use of the term "payment" is unambiguous, and would appear to plainly defeat plaintiffs' claim. The monies in question were received from a sale conducted pursuant to regulations implementing section 202(a) of the Relocation Act, but they were not a "payment from the head of such Agency" under that section.

The court's reading is supported by principles of statutory construction, the foremost relevant one being that a word is known by the company it keeps:

> If the legislative intent or meaning of a statute is not clear, the meaning of doubtful words may be determined by reference to their relationship with other associated words and phrases.
>
> ....
>
> ... Where the meaning of a word is unclear in one part of a statute but clear in another part, the clear meaning can be imparted to the unclear on the assumption that it means the same thing throughout the statute.

2A Sands, Sutherland Statutory Construction § 47.16 (rev. 4th ed. 1984) [hereafter cited as "2A Sands"].

The Supreme Court applied this principle in a case involving another tax statute, in which a word also susceptible of an inherently broad construction was used:

> 'Discovery' is a word usable in many contexts and with various shades of meaning. Here, however, it does not stand alone, but gathers meaning from words around it. These words strongly suggest that a precise and narrow application was intended in § 456.
>
> ... The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Act of Congress.

*Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

The same reasoning applies full weight to parallel terminology used throughout various sections of a statute. 2A Sands at § 47.16; *see also Board of Supervisors v. Marshall*, 214 S.E.2d 146, 150 (Va.1975); *Postal Telegraph Co. v. Farmville*, 96 Va. 661, 32 S.E. 468, 470 (1899).

Plaintiffs argue that this is too cramped a reading of the term "payment." Rather, they contend that when viewed in the broader context of the regulations and the Relocation Handbook, "payment" includes the proceeds of private sales. The court disagrees.

In terms of statutory construction, the *context* from which the meaning of a word is drawn must of necessity be the words of the statute itself. The regulations adopted after passage cannot alter that original setting.[3] The question is, at the time of passage, what did the term "payment" mean? Here, no ambiguity exists because of the

---

3. This is not to say that the interpretation of an ambiguous term may not be elucidated by considering the construction put on it by the agency empowered to implement the statute. In that case, the agency's view of the meaning of the term, *within the original statutory context*, would be relevant. *See, e.g., United States v. American Trucking Ass'n*, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940); 2A Sands at § 4903.

very structure of the act and the wording of section 216. Unlike instances cited by plaintiffs, here the least strained reading of the provision is that, following a string of references to payments by government entities, section 216's use of the term "payments" was intended merely as a shorthand incorporation of the previous references in the statute.

Plaintiffs argue that since the term "payment" in section 216 is not qualified in the same ways it is in the preceding sections, Congress used the term in a sense which is broader than the cumulative uses found in the other sections.[4] If section 216 did not specifically advert to the use of the term in other sections of the act, that argument might be tenable, but here it is not. For section 216 to have any meaning, it must be seen as incorporating by direct reference.

Even assuming for the sake of argument that the regulations and policies implementing the Relocation Act provide part of the context for interpretation, plaintiffs' view is not advanced. The argument particularly loses force when it is observed that the regulation involved, section 42.70, parallels the statute in using the term "payment" only to refer to monies received from the state agency. It specifically refers to the fruits of the private sale, however, as "proceeds." Such proceeds are never referred to as a payment. The same is true of the Relocation Handbook.

In the final analysis, plaintiffs' argument is that since the private sale was compelled by the regulations in order to fix the amount of the "actual direct loss" payment by CRA, the sales were "under" the Relocation Act. In a sense this is true. Although plaintiffs were in the business of selling scrap, the sales here were forced by the act, and therefore dissimilar from sales which would have occurred in the normal course of operation.

It is plain, however, from the statute, the regulations and the handbook, that the terms "payment" and proceeds are used to refer to functionally separate things. *Sales proceeds* go into the calculation of a *payment,* but they are not the same thing as a payment. There is no entitlement to a "payment for direct loss" until a loss is first established by subtracting the proceeds from the appraised fair market value.

The fact that the CRA benefitted by a proportionate reduction in the "value not covered by the sale" cannot blur the distinction between what are in effect a subtrahend and a remainder in a subtraction problem.

### The Purpose of the Relocation Act

Plaintiffs urge that a broader interpretation of the term "payment" is more in line with the purpose of the Relocation Act. Plaintiffs correctly point out that one of the overriding purposes of the act is to provide "uniformity in treatment of persons displaced by Federal or federally financed projects." Plaintiffs' Opposition at 16. They go on to urge, however, that treating inventory sales proceeds as taxable income creates potential disparities. "Under defendant's interpretation, displaced persons such as plaintiffs will receive differing net dollar amounts depending upon the amount of money for which they sell their personal property...." *Id.* at 18. They then set up a hypothetical example in which the net after tax result is different as between a person who received very little at the sale (favorable end result), and one who received more (unfavorable).

---

4. Plaintiffs rely on *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972), and *Lankford v. Law Enforcement Assis. Admin.,* 620 F.2d 35 (4th Cir.1980), for the proposition that "clear use of different terminology within a body of legislation is evidence of intentional differentiation." *Lankford,* 620 F.2d at 36. The courts' holdings in those cases were based on statutes that are distinguishable in relevant part from § 216. Indeed, the courts' analysis support by inference the result here. More to the point, however, the result here is fully consistent with the legal principle plaintiffs draw from the two cases. The very phraseology within § 216 which plaintiffs point to as distinct from other uses of the term "payment" makes it clear that § 216 is an incorporation by reference of those previous uses. For that reason, Congress had no need to repeat all the previous modifiers of the term "payment," and instead simply used the generic (within the limits of the subchapter) term.

Plaintiffs point to the anomaly that, in the example, the greater the sales proceeds, the less the net proceeds.

The court observes initially that the example is totally unlike plaintiffs' actual circumstances in that the hypothetical moving expense is 95% of the fair market value. As defendant's reply brief points out, that considerably affects the result. Defendant volunteers its own hypothetical with lower moving costs in which there is no such anomalous and counterproductive pressure at work, and in which the opposite is true— that the owner directly benefits from every additional dollar received.

■ Any number of variables other than moving costs, which in themselves are the produce of several circumstances, however, also have the potential for creating a different net dollar result, not the least of which are the particular taxpayer's basis in the property and his tax bracket. In the court's view, such differences which are peculiar to the individual do not fall within the mischief which prompted passage of the Relocation Act. The court has reviewed the lengthy legislative record surrounding the act and is satisfied that its purpose was to consolidate federal relocation efforts and standardize the type and amount of relief available to dislocated persons, regardless of the agency involved.[5] It would be hopeless to try to craft the type of end-result homogeneity contemplated by plaintiffs, and the legislative history of the act fails to indicate that Congress had an intent to do so. What is critical is that people in identical circumstances are treated in the same way. The same formulas and policies apply to all.

## Estoppel

Plaintiffs claim that the government is estopped from including the proceeds because of representations made that sales proceeds under the Relocation Act are excludable from income. Plaintiffs assert that both orally and in writing, CRA officials told them that "the proceeds from the sales would be excludable from income." Plaintiffs' Opposition at 24. These CRA assurances were based in turn, on representations made by HUD employees.

An administrative official can only exercise such authority as has been conferred upon him. It follows that the government is not bound by the unauthorized actions of its agent. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1974); *Housing Corporation of America v. United States*, 199 Ct.Cl. 705, 711–12, 468 F.2d 922, 925 (1972).

Plaintiffs, therefore, in order to prevail in their argument, must be able to show that the employees in question were authorized to make statements about the coverage of section 216 which are binding on the defendant. *See Allen v. United States*, 199 Ct.Cl. 515 (1981); *Hamilton Bank v. United States*, 6 Cl.Ct. 267 (1984).

■ On its face, plaintiffs' argument fails. Whatever representations were made to plaintiffs were made by employees

---

5. The purpose of the relocation title was expressed by Senator Muskie, then chairman of the subcommittee considering the bill:

> The primary objective of S.1 is to establish a uniform policy among Federal agencies, and state and local recipients of Federal funds in their dealing with property owners and others displaced by Federal or federally aided land acquisitions.

115 Cong.Rec. 31,533 (1969).

He had earlier pointed out the problem addressed by the legislation:

> Nearly all federally assisted programs have differing,· if not conflicting, provisions for helping those displaced. They range from no assistance in some cases to liberal benefits and protection in others.

*Id.; see Norfolk Redevelopment & Housing Auth. v. C & P Telephone*, 464 U.S. 30, 36, 104 S.Ct. 304, 307, 78 L.Ed.2d 29 (1983) (widely varying treatment received by displaced persons before the passage of the act); *Alexander v. HUD*, 441 U.S. 39, 49–50, 99 S.Ct. 1572, 1580, 60 L.Ed.2d 28 (1979) (act intended to standardize federal legislation); *Robzen's Inc. v. HUD*, 515 F.Supp. 228, 232–33 (M.D.Pa.1981) (Relocation Act designed to eliminate discrepancies among different laws); *Uniform Relocation Assistance and Land Acquisition Policies Act of 1969*, Hearings Before the Subcomm. on Intergovernmental Relations of the Senate Committee on Government Operations, 91st Cong., 1st Sess. *passim* (1969) (statements by numerous witnesses and subcommittee members).

of CRA. Although CRA receives federal monies, it is not a federal agency. It is a political subdivision of the State of Massachusetts. A statement by an employee of a state agency, regardless of how explicit, cannot estop the government from arguing as to the legal effect of a statute. *See Dixon v. United States*, 381 U.S. 68, 72–73, 85 S.Ct. 1301, 1304, 14 L.Ed.2d 223 (1965). Moreover, even if CRA's statements could be attributed to employees of HUD, that federal agency has no responsibility or authority with respect to enforcement of tax laws and could not be authorized to bind the government in that area.

More importantly, even assuming that the representations were made by persons authorized to bind the Service, which is not asserted here, the specific representations alleged are of necessity beyond the authority of even such persons to make. The ultimate question to be resolved here is the legal effect of section 216. Although the Service's position on that issue is relevant, even when it rises to the level of a revenue ruling, it cannot bind this court. *Columbus Fruit & Vegetable Co-operative Ass'n v. United States*, 7 Cl.Ct. 561 (1985);[6] *see also Dixon* 381 U.S. at 72–73, 85 S.Ct. at 1304; *City of Alexandria v. United States*, 737 F.2d 1022, 1028 (Fed.Cir.1984); *Garvey, Inc. v. United States*, 726 F.2d 1569 (Fed.Cir.1984). *See generally* Annot., 27 A.L.R.Fed. 702 (1976).

### CONCLUSION

■ The court holds that the proceeds received by plaintiffs from the sale of goods are included in gross income and do not fall within section 216 of the Relocation Act.[7] Accordingly, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment is granted. The clerk of the court is directed to dismiss the complaint. No costs shall be assessed.

IT IS SO ORDERED.

6. Although a revenue ruling might have been binding between the parties, plaintiffs did not seek such a ruling.

7. It follows, and defendant has not contested, that plaintiff may consequently deduct from gross receipts the cost of the goods sold.