The NATIONAL BANK OF
SOUTH CAROLINA

v.

The UNITED STATES.

No. 381–78.

United States Claims Court.

Oct. 8, 1982.

See also 223 Ct.Cl. 573, 621 F.2d 1109.

William E. DuRant, Jr., Sumter, S.C., for plaintiff; Schwartz & DuRant, Sumter, S.C., of counsel.

Elizabeth Langer, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION *

PHILIP R. MILLER, Judge:

The Farmers Home Administration (FmHA) is a federal agency which, among other functions, lends money to farmers, who are unable to obtain sufficient credit at reasonable rates and terms elsewhere, for acquiring farm property. 7 U.S.C. §§ 1922, 1981.

In the making of such loans it is a policy of FmHA to encourage farmers to make "[m]aximum use * * * of other credit when a workable arrangement is possible." 7 C.F.R. § 1821.11(d) (1976).[1] Toward that end the regulations also provide that "[i]n determining the eligibility of an applicant if

it appears that he may be able to obtain part or all the credit from other sources to meet his needs, the [FmHA] County Supervisor will require him to make a diligent effort to obtain such other credit." 7 C.F.R. § 1821.11(d)(1).

In recognition of the fact that the Federal land banks are a likely other source of credit, the FmHA has worked out "A 'Memorandum of Understanding Between the Farmers Home Administration and the Farm Credit Administration,'[2] [which] will serve as a guide in processing [farm ownership] loans to be made simultaneously with loans by Federal Land Banks to common applicants." 7 C.F.R. § 1821.11(d)(2). The Memorandum provides that the FLB and FmHA state director may enter into a memorandum of understanding concerning the simultaneous processing of initial farm ownership loans by the FmHA and long-term real estate loans by the FLB to a mutual borrower. It also calls for mutual agreements for participation of the representative of each lender in loan closing, title search, supervision, counseling, and administration of the loans.

The Federal Land Bank manual also contains provisions with respect to the making of loans by local FLBs jointly with the FmHA and procedures for their joint administration, to wit:

> 4220.59 *Procedure for Handling FHA Supervised Jointly Financed Improvements.* (a) In those cases where improvements are to be jointly financed by the Farmers Home Administration and it is necessary to trustee funds for said purpose, the following procedure is to be followed:
>
> (b) The FHA Supervisor or other designee will have authority and responsibility for supervising said improvements in accordance with plans and specifications incorporated and required as a part of the FLB loan com-

---

* The subject opinion was originally filed in the Court of Claims September 24, 1982 as a Trial Judge's Report and converted to a judgment by the Claims Court pursuant to an order of October 8, 1982.

1. All references to the Code of Federal Regulations hereinafter will be to the 1976 edition.

2. The Farm Credit Administration has the responsibility for supervision of the Federal land banks. 12 U.S.C. § 2012.

mitment. The FLBA will provide an official copy of said commitment as well as a copy of the trust agreement.

In August 1976 FmHA lent Thomas and Barbara Bradham, husband and wife, $38,-380 for the purchase of certain farm acreage. The money was deposited by FmHA in a depository account in the Bradham name and was to be withdrawn only on the joint signatures of the depositor and the authorized FmHA representative. Contemporaneously the Federal Land Bank of Columbia, South Carolina (FLB), lent the Bradhams $45,000 for the construction of a residence and storage facility on such farm land, of which $36,080 was escrowed by the FLB and to be made available in installments upon completion of the various stages of construction. Both loans were secured by mortgages.

On August 17, 1976, the Bradhams entered into a construction contract with one Winfield Mims, a builder, for the construction of the house for $29,850. Mr. Mims was to receive progress payments biweekly, the aggregate of which was not to exceed 60 percent of the value of the work in place, and the final installment upon satisfactory completion of the project.

Mr. Mims was not in good financial condition and applied to plaintiff, the National Bank of South Carolina, for interim financing to meet his payrolls and materialmen's bills in connection with the construction. William B. DeWitt, manager of plaintiff's Manning branch, initially rejected Mr. Mims' application on the grounds that his credit with the bank was already fully extended and the bank was unwilling to provide any further unsecured financing to him. However, on September 7, 1976, Mr. DeWitt called Mr. Billy K. Foxworth, County Supervisor for the FmHA for Clarendon County, South Carolina, informed him that Mr. Mims was attempting to obtain a $13,-000 loan from the bank for the construction of the Bradham residence and inquired about Mims' construction contract. After Foxworth verified Mims' contract, DeWitt stated that plaintiff was considering making a $13,000 maximum loan commitment

to Mims and asked whether plaintiff could be made joint payee on checks to Mims from the FLB's escrow account for the Bradham construction loan to cover the plaintiff's loan commitment. Foxworth agreed that he would request the FLB to do so. On the same day Foxworth, signing himself as County Supervisor for FmHA, sent a letter to DeWitt, with copy to FLB, in which he stated:

In accordance with our telephone conversation this date you are advised that National Bank of South Carolina will be shown as joint payee on all checks issued to· Winfield Mims for the construction of the Thomas M. Bradham dwelling.

The contract price for construction of the dwelling if [sic] $29,850.  * * *

Funds for payment of this contract are being held in escrow by Federal Land Bank. Federal Land Bank is being notified by a copy of this letter to show National Bank of South Carolina as joint payee on all checks.

At the time Mr. Foxworth wrote this letter he had not discussed either with his superiors or with FLB officials the proposal for FLB issuing checks showing the plaintiff as joint payee with the construction contractor. Indeed he had never made such a recommendation previously, and he did not know whether or not the FLB would approve the practice. At trial he explained that he had done it as a courtesy to plaintiff.

On the following day, September 8, 1976, after receipt of Foxworth's letter, the local loan committee of the plaintiff's Manning office approved a maximum loan commitment of $13,000 to Winfield Mims for use in the construction of the Bradham residence. During the course of construction, Mr. DeWitt authorized and actually advanced a total of $15,000 to Mr. Mims for the Bradham project, exceeding the maximum loan commitment set by the loan committee by $2,000.

On October 8, November 5 and December 16, 1976, the FLB issued checks in the sums of $6,600, $3,600 and $3,200 respectively, the payees of which were the Bradhams, Mims

Builders, plaintiff and FmHA jointly. None of the $13,400 total was applied by plaintiff toward the repayment of Mr. Mims' construction loan; instead, the checks were endorsed by the plaintiff and the other payees and turned over to Mr. Mims. Mr. Foxworth endorsed the checks in the name of FmHA.

On March 21, 1977 Mr. Foxworth wrote a letter to Mr. Gardner Gore, president of the FLB, noting that after completion of the Bradham dwelling the FLB still held $16,450 in escrow for payment of the construction costs and FmHA retained an additional $3,069, or a total of $19,519, but almost all of this would be needed to cover outstanding bills of $18,793 for materials and labor incurred by Mims in connection with the construction. To preserve the available funds for paying the materialmen and mechanics, Foxworth concluded—

> We are enclosing a copy of NBSC record indicating that FmHA agreed to make checks jointly for a $13,000.00 loan. Your records will show that three checks have been issued totaling $13,400.00. Based on copies of the cancelled checks a determination has been made that our obligation to NBSC has been met.
>
> Based on the above you are requested to issue checks to the vendors which have contacted our office and substantiated their claims for payment.
>
> When the remainder of the debts have been substantiated, we will request additional checks be issued.

On May 11, 1977 Mr. Foxworth again wrote to Mr. Gore of the FLB, noting that after 30 days no additional unpaid bills had surfaced and no mechanics and materialmen's liens had been recorded. Accordingly he requested that the FLB issue the final check for the Bradham project again jointly payable to Mims Builders, Bradham, FmHA and the plaintiff. On May 12, 1977 the FLB issued a $1,253.07 check payable as so requested; and the record indicated that this sum was applied by plaintiff to reduce Mr. Mims' indebtedness to it.

Mr. Mims defaulted on his debt obligations to the plaintiff, and plaintiff obtained in state court a judgment for the $15,000 which Mims owed it. Execution on the judgment was returned "*nulla bona.*"

Plaintiff here seeks to recover the $15,000 from defendant on the theory that its damages resulted from a breach of contract by defendant; *i.e.,* that plaintiff advanced that sum to Mims in reliance upon defendant's agreement to cause the FLB's advances of installments on the Bradhams' construction loan to be made payable to Mims and plaintiff jointly instead of to Mims alone, and that defendant breached that agreement. The government asserts a variety of defenses: (1) that plaintiff's losses resulted from the actions of the Federal Land Bank, which is not an appropriated funds agency of the United States and for whose actions the United States has not consented to be sued in this court; (2) that Mr. Foxworth, the FmHA County Supervisor, was never delegated authority by FLB to make binding commitments with respect to the disposition of FLB construction funds; and (3) assuming there was an agreement binding on the United States, it was limited to having plaintiff made joint payee on the first $13,000 in FLB checks, the amount of Mims' line of credit, and the FLB had complied with that agreement.

This case has been before the Court of Claims previously, on cross motions for summary judgment. *National Bank of South Carolina v. United States,* 223 Ct.Cl. 573, 621 F.2d 1109 (1980). The court denied both motions on the ground that there were disputed issues of fact to be decided.

In support of its motion defendant argued that Foxworth, as a county supervisor of the FmHA, lacked authority from the United States to make a binding representation concerning the disbursement of the FLB loan funds escrowed for construction of the Bradham residence. But the court ruled that even if Mr. Foxworth lacked authority from FmHA this did not preclude his obtaining it from the FLB. The court stated that it was "unable to ascertain whether the FLB of Columbia, South Carolina, delegated to FmHA's Mr. Foxworth authority over the disbursement of any of

the FLB loan funds escrowed for construction of the Bradham residence"; that "[i]f it is found later that a delegation was made, the extent of the delegation must be determined"; and that these were "two material issues of fact [which] remain genuinely in dispute at this stage of the litigation." 223 Ct.Cl. at 577–78, 621 F.2d at 1111–12.

However, in its post-trial brief plaintiff now disclaims any argument that the liability of the United States is founded on the actions of the FLB, whether directly or through an agent. This concession is clearly correct. For, as the court further stated in its opinion, "Each Federal land bank is a farmer-owned corporation with no connection with the Federal Government other than being supervised by the [Farm Credit Administration]." 223 Ct.Cl. at 576, 621 F.2d at 1111. And *see also* 12 U.S.C. § 2011 and 12 C.F.R. § 600.20.[3] Thus we must consider now only whether the United States is liable to plaintiff for some action or failure to act by FmHA in breach of a duty it owed to plaintiff.

It is decided herein that FmHA did not breach any duty it owed to plaintiff.

█ Assuming that the agreement of September 7, 1976 between Foxworth and plaintiff was duly authorized by FmHA and was a valid contract, it was not breached by Foxworth. The agreement was that "National Bank of South Carolina will be shown as joint payee on all checks issued [by the FLB] to Winfield Mims for the construction of the Thomas M. Bradham dwelling." (Underscoring supplied.) The only checks issued by the FLB to Winfield Mims for such construction, totalling $14,653.07, did show the National Bank of South Carolina as joint payee. The remaining advances by FLB (and FmHA) for the construction, at least $18,793.52, were paid to laborers, mechanics and suppliers of materials going into the construction, not to Mims. Thus the issuance of such checks did not breach the agreement.

For plaintiff to prevail on this issue, it would have to establish that Foxworth's September 7, 1976 letter to plaintiff was not the agreement of the parties and did not accurately record their agreement— that their real agreement was that plaintiff should be a joint payee on *all* checks from the FLB escrow account for construction advances, no matter who the other payees were—Bradham, Mims, the workmen or the suppliers. But plaintiff made no effort to carry that burden at trial. To the contrary, while defendant argued that the letter did not convey their understanding that the agreement was limited to the first $13,000 of Mims' debt, plaintiff contended that the letter was the agreement. Plaintiff's principal witness, its former bank manager, Mr. DeWitt, testified that the bank officials felt that the bank loan to Mims was "secured by the letter we received from Mr. Foxworth." Moreover, had the letter misstated their agreement, it is reasonable to believe that plaintiff would have replied with a correction. But there was none.

It must also be kept in mind that the subject of the agreement, the funds used to pay for the construction, although placed in escrow by the FLB, was money advanced to the Bradhams on their note and belonging to them. If Foxworth's agreement were construed to mean that FmHA had promised to use such funds to pay Mims' debts, to the exclusion of the claims and liens on the property by workmen and materialmen, it would also bar payment to the Bradhams so that they could use the money for such purposes. It would amount to a diversion of the Bradhams' funds without any evidence of consent by them or *quid pro quo.* Furthermore, such an agreement would bar FmHA and the FLB from paying mechanics and materialmen's claims. It would mean that FmHA had agreed to give control of

---

**3.** In any event, it is difficult to impute to the FLB, a private institution with fiduciary responsibilities to depositors, stockholders, and others, the intent to authorize a person, who was not even its officer or employee, to bind it to allowing another bank to have priority of claims over construction suppliers and laborers and thereby to subordinate FLB's own mortgage lien to materialmen's and mechanics liens. This is particularly true where the FLB received no valuable consideration to it for assuming such a risk.

the construction fund advances to plaintiff in preference to the claims of workmen and materialmen, even if it meant displacement and impairment of FmHA's and the FLB's own mortgage liens by those of the unpaid mechanics and materialmen. There is no basis for imputing such intent to Foxworth or to the FmHA.

Finally, if the agreement between Foxworth and plaintiff could be construed as plaintiff claims, the question would remain as to whether or not Foxworth, as FmHA County Supervisor, had authority from that organization to bind it to an agreement to have the FLB pay out its construction loans to the builder's bank-creditor rather than to the borrower, the builder, or lien holders. For, as the court also stated in its prior opinion, it is a "time-honored principle that the Federal Government is not bound by its agent acting beyond his authority and contrary to regulation." 223 Ct.Cl. at 577, 621 F.2d at 1111. *See also Schweiker v. Hansen,* 450 U.S. 785, 788–89, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Yosemite Park and Curry Co. v. United States,* 217 Ct.Cl. 360, 370, 582 F.2d 552, 558 (1978). "One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with actual authority to enter the contract alleged." *Haight v. United States,* 209 Ct.Cl. 698, 538 F.2d 346, *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). It also is "well established that the government is not bound by the acts of an agent who only has apparent authority." *Jackson v. United States,* 216 Ct.Cl. 25, 41 n. 2, 573 F.2d 1189, 1197 n. 2 (1980). *See also Bornstein v. United States,* 170 Ct.Cl. 576, 582, 345 F.2d 558, 562 (1965).

Plaintiff claims that Foxworth possessed the requisite authority because (1) FLB had turned over to FmHA control of the funds FLB held in escrow for the Bradham construction loan, and (2) by virtue of his position as county supervisor Foxworth had authority to commit FmHA for particular disbursements. Neither of these arguments is supportable.

As discussed earlier in this opinion, the relationship between the FmHA and the Federal land banks as other lenders making loans simultaneously with FmHA is governed by a "Memorandum of Understanding" between the FmHA and the Farm Credit Administration. But the Memorandum is wholly inconsistent with the notion that the FLB will give control over its funds to FmHA or vice versa. The Memorandum states:

II. POLICIES: The basic policies of each lender will continue to apply when processing each individual loan * * *.

A. *Eligibility determination must be made by each lender.*

\* \* \* \* \* \*

B. *Loan processing.*

1. An FHA representative will make the appraisals for FHA farm ownership loans.

2. An appraiser designated by the FLB will make the appraisals for land bank loans.

3. Each lender will determine the applicant's ability to repay his total indebtedness as part of its loan approval.

\* \* \* \* \* \*

C. *Loan Closing.*

\* \* \* \* \* \*

2. The FHA and FLB representatives will mutually approve any land and building development plans when the improvements are to be projected in loan values. Each will supervise the disbursement of its share of funds for these items.

\* \* \* \* \* \*

D. *Supervision.* * * *

1. The loan(s) made by each lender will be serviced in the usual manner by its respective representative unless special problems develop that require consideration by both representatives.

The Memorandum of Understanding between FmHA and Farm Credit Administration representatives in South Carolina further provides:

B. *Loan Processing*

\* \* \* \* \* \*

2. Cost of individual items of development will be financed by only one creditor—all development planned by either creditor will be concurred in by both lending representatives.

C. *Loan Closing*

\* \* \* \* \* \*

5. Each agency will handle the disbursement of their loan funds in their usual manner including letting contracts, inspections and payments.

Although, as previously noted, the FLB manual authorizes a Federal land bank to permit the FmHA supervisor to supervise jointly financed improvement programs, the Federal land bank must still retain control over its own funds. In this connection the manual states:

4220.59 *Procedure for Handling FHA Supervised Jointly Financed Improvements.*

\* \* \* \* \* \*

(f) In those instances where improvement funds are trusteed by either the FLBA or FHA separately, the organization furnishing the funds will be directly responsible for administering the fund, even if the two organizations are participating in the loan.

In the instant case, the purchase of the farm acreage was financed by the FmHA, while the construction of the Bradham residence was financed by the FLB. Nothing in the regulations, the Memorandum of Understanding or the manual gave Mr. Foxworth authority over the FLB funds. The record indicates further that no one at the FLB delegated to the FmHA authority over the disbursement of funds held in the construction account.

Mr. Gore, President of the Federal Land Bank in Columbia, South Carolina, testified that he had never delegated authority to Mr. Foxworth either to make representations binding on the Federal Land Bank in regards to making plaintiff a joint payee on FLB checks or to control the actual disbursement of FLB loan funds. The FLB is an entirely separate entity from the FmHA, and there is no inherent structural relationship which could have afforded Mr. Foxworth such authority.

The necessary delegation of authority also cannot be implied from the course of dealing between the FmHA and the FLB. While the FLB did rely on Mr. Foxworth's recommendations as to whether FLB funds should be released to Mr. Mims, it still reserved control over its own funds and the conditions under which they would be released, was free to make its own inspections, and in fact inspected the Bradham property several times prior to final payment. It also appears that this was the only time that a FmHA official in Clarendon County ever agreed to request the FLB to show another bank as joint payee on checks issued under a FLB loan.

More important is the absence of any evidence of delegation of authority by FmHA to Foxworth to make the kind of agreement with plaintiff, a third person, that plaintiff relies upon—that construction fund advances, for which the borrowers had signed a note, would be channeled to plaintiff as a creditor of the builder, in preference to the payment of the claims of the borrowers, the workmen and materialmen, even if such action resulted in liability to the borrowers, or in the displacement or impairment of FmHA's and the FLB's own mortgage liens. Foxworth's function was to protect the security interest of the United States, not to dilute it.

Plaintiff's claim is in essence that Foxworth on behalf of FmHA guaranteed repayment to plaintiff of the loans it had made to Mims. That Foxworth's position as county supervisor does not include such authority is apparent from the very regulation which provides for cooperation between FmHA and other lenders. After discussing the role of the county supervisor in furthering cooperation with other lenders, the regulation expressly warns that "FmHA employees may not guarantee personally or on behalf of FmHA, repayment

of advances from other credit sources." [4] In other words, Foxworth was expressly forbidden to guarantee that either the FLB or the plaintiff would be repaid what it had advanced.

In view of the foregoing it is unnecessary to consider defendant's additional defenses.

For the reasons stated plaintiff is not entitled to recover, and its petition should be dismissed.

---

4. 7 C.F.R. § 1821.11 states:

(d) *Relationships with other lenders.* Maximum use will be made of other credit when a workable arrangement is possible. County Supervisors will keep real estate lenders and building suppliers currently informed concerning FmHA policies with respect to loan making, security requirements, supervision and servicing, distribution of income available for debt payments, and graduation of borrowers. FmHA employees may not guarantee personally or on behalf of FmHA, repayment of advances from other credit sources. However, they may assure that lien priorities will be respected and releases will be made in accordance with the current Form FmHA 431–2, "Farm and Home Plan," as agreed with the borrower.