**Corena BRADSHAW, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 618–84C.

United States Claims Court.

Dec. 1, 1988.

Rodney G. Johnson, Phoenix, Ariz., for plaintiffs.

E. Kathleen Shahan, Washington, D.C., with whom were Asst. Atty. Gen. Richard K. Willard, Director David M. Cohen, Asst. Director Thomas W. Petersen, for defendant. Susan Ptacek, Veterans Administration and Stanley Ericsson, Dept. of Health and Human Services, of counsel.

## MEMORANDUM OPINION

LYDON, Senior Judge:

Plaintiffs in this case are Corena Bradshaw (C. Bradshaw), in her capacity as Guardian and Conservator of the person

and estate of Glen Bradshaw (G. Bradshaw), and C. Bradshaw, individually, as the wife of G. Bradshaw (hereinafter referred to as "plaintiff"). Plaintiff alleges a breach of contract by the Veterans Administration (VA) for failing to provide "complete medical care, treatment and facilities" in a VA Hospital "for the remainder of the natural life of Glen Bradshaw without cost, expense or charge being made to Glen Bradshaw or his legal representative or estate." Defendant claims there was no breach of contract.[1] Both parties have moved for summary judgment, each asserting there are no genuine issues as to any material facts, and asserting entitlement to a judgment as a matter of law. Upon consideration of the parties' submissions, and after oral argument, the court concludes that defendant's motion for summary judgment should be granted.

### FACTS

G. Bradshaw was an honorably discharged veteran of the United States Armed Services prior to February 23, 1969. On that date, he suffered multiple injuries in an automobile accident, including a skull fracture. He was admitted to a Veterans Administration Medical Center (VAMC) in Phoenix, Arizona. His injuries were not service connected.[2] His diagnosis was "non-psychotic Organic Brain Syndrome with brain trauma." On June 22, 1970, C. Bradshaw sought and obtained from the Superior Court of Maricopa County, Arizona an Order of Commitment wherein it was "Ordered and Adjudged" that "Glen Bradshaw is mentally ill" and "is incompetent."

It was further "Ordered and Adjudged" that he "be confined in the Arizona State Hospital at Phoenix, Arizona or Veterans Administration Hospital until sufficiently restored to reason or otherwise discharged according to law." The Order of Commitment further directed that G. Bradshaw be delivered "unto the custody of [a] Veterans Administration Hospital."

On August 13, 1970, G. Bradshaw was transferred to the VA Hospital, Fort Lyon, Colorado, where he remained through May 22, 1981. Previously, he had been a patient in VA Hospitals and facilities in Arizona since February 23, 1969.

Prior to April 1973, the VA had billed plaintiff for medical services provided G. Bradshaw relative to his February 1969 accident. This bill amounted to about $29,-000. *See* n. 2, *supra.* Negotiations ensued between the VA and plaintiff relative to this billing which resulted in a settlement of the matter, memorialized in a letter dated April 16, 1978 from James T. Balamenti (Balamenti), chief attorney for the VA Regional Office, Phoenix, Arizona to G. David Gage (Gage), the attorney for plaintiff. This letter read in pertinent part as follows:

> Please be advised the Veterans Administration will accept the sum of $15,000.00 in full settlement of past, present and future claim for hospital charges incurred by the above named veteran as a result of his accident which occurred on or about February 23, 1969 in Glendale, Arizona. Past, present and future VA hospital charges as above stated include all 1969–1970 care and treatment at the

---

1. Plaintiff's complaint initially sets forth Four Claims for Relief. Claims Two (Specific Performance) and Four (Social Security Benefits) were dismissed by the court in a Partial Judgment issued, pursuant to Rule 58, on April 10, 1986. Claim Three, a claim for Declaratory Judgment, is deemed outside the jurisdiction of the court and is likewise subject to dismissal. *See United States v. King,* 395 U.S. 1, 3–5, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969); *Williams Int'l Corp. v. United States,* 7 Cl.Ct. 726, 729 (1985). Further, the relief sought under Claim Three is subsumed by Count One so the dismissal of Claim Three is harmless. Claim One sets forth the breach of contract claim considered herein.

2. The VA was authorized to furnish hospital care to G. Bradshaw for nonservice-connected disabilities. *See* 38 U.S.C. § 610 (1976). If a veteran is unable to defray the costs and expenses of necessary care and services they are assumed by the VA. However, the veteran, or other responsible party, must pay such costs and expenses if the veteran has ample assets and resources to do so. This is so because medical care and services provided in VA Hospitals to veterans for nonservice-connected injuries are permissive and not mandatory. *See United States v. Dairyland Ins. Co.,* 644 F.Supp. 702, 705–06 (1986 D.C.Ga.).

VA Hospital, Phoenix, Arizona, and all past, present and future charges for medical care treatment and institutional care at VA Hospital, Fort Lyon, Colorado. In consideration of said payment, Mr. Bradshaw will be entitled to remain as a patient at the VA Hospital, Fort Lyon, Colorado, or at some similar facility for the duration of his life without further charge.

The undersigned is authorized by Veterans Administration regulations to make this offer of settlement. This offer has the prior approval of our General Counsel and the Justice Department.

Upon approval by the guardian and the court of this settlement, check should be made payable to the Veterans Administration and forwarded to the above address.[3]

The above agreement is the focal point of this litigation.

Subsequently, C. Bradshaw paid $15,000 to the VA relative to the April 16, 1973 letter, *supra*. The record does not indicate the source of these funds but it would be reasonable to assume that they came from a resolution of the automobile accident which caused G. Bradshaw's injuries. Oral argument confirmed this assumption. It would appear that from April 16, 1973 until May 22, 1981, G. Bradshaw remained a patient at the VA Hospital in Fort Lyon, Colorado, and was not billed by the VA for any of the services he received during that period.

In August 1977, medical personnel at the VA Hospital in Fort Lyon recommended that G. Bradshaw's commitment be discontinued. In support of this recommendation it was noted that G. Bradshaw had recently been home on a fourteen-day pass at Christmas time with no bad reports. While observing that he was not dangerous to himself or others, the medical personnel felt that he still needed a supervised, structural environment.[4]

In 1978 VA medical records, VA medical personnel again voiced the view that G. Bradshaw had received maximum hospital benefits and could be discharged. They noted that he functioned "fairly independently." They also noted that he could dress, bathe and feed himself; that he worked at various jobs well, for example, in the Hospital's green house, laundry, and patient work shop area, designated Kit Carson Workshop; that he was friendly and well liked by VA staff and patients; that he had full hospital privileges and never abused them; and that he went into town on a bus, without supervision, on many occasions, and had taken public transportation by himself to visit relatives in St. Louis, Missouri and Phoenix, Arizona.[5]

---

3. Defendant agrees that Balamenti, as chief attorney for the Regional Office of the VA, was authorized, within certain limitations, to make an offer of settlement in matters of this kind. No substantiating evidence exists, defendant avers, that either the VA Central Office in Washington, D.C., or the Department of Justice ever saw or approved the settlement agreement as embodied in the April 16, 1973 letter. While Balamenti, in his deposition, admitted his signature on the April 16, 1973 letter, he was unable to recall who prepared the document. Indeed, he could not at the time of his deposition recall the G. Bradshaw case at all. He did state, however, that he would not sign an agreement such as set forth in the April 16, 1973 letter unless he was sure that the Central Office knew he was doing it. Balamenti stated in his deposition that this was a most unusual kind of settlement agreement and the only such one he ever saw. Yet he had no independent recollection of the Bradshaw case itself. Balamenti retired from the VA in May 1977.

4. The medical records of G. Bradshaw indicate that as of May 1976, he had gone on numerous town passes and had done very well on them. He was very talkative and friendly, but sometimes laughed inappropriately. Since his hospitalization, there had been no recorded incidents of altercations or temper tantrums by G. Bradshaw. The medical records of May 1976 indicate that G. Bradshaw had previously asked to be returned home. C. Bradshaw was notified of his request in this regard. As of May 1976, G. Bradshaw had asked to be released to a community placement with another patient at the Hospital. This possibility of G. Bradshaw going into community placement was also discussed with C. Bradshaw by VA medical personnel. VA medical personnel also inquired of C. Bradshaw as to what plans she had for her husband. C. Bradshaw insisted at all times that G. Bradshaw be confined to a VA Hospital.

5. VA medical personnel recognized that G. Bradshaw was handicapped with brain damage.

It was the consensus of VA medical personnel that G. Bradshaw could do quite well with some minimal supervision, such as the type that exists in a foster home, boarding home or with some willing relative. G. Bradshaw had mentioned to VA personnel at one time his desire to be near his brother and relatives in St. Louis, Missouri.

C. Bradshaw rejected the position of VA medical personnel that G. Bradshaw be released from hospital commitment since he had received maximum hospital benefits and was no longer in need of continued hospitalization. She engaged a lawyer to ensure her position that G. Bradshaw be committed to a VA Hospital for the rest of his life be made clear. In light of this opposition, the VA Hospital at Fort Lyon sought legal advise concerning the release of G. Bradshaw from hospital commitment and considered other ramifications that might be involved in any such relief. The objections of C. Bradshaw were not taken lightly by the VA.

In September 1978, G. Bradshaw was assigned permanently to the Kit Carson Workshop where he appeared to show more interest and maintained more regular attendance. At this time, VA medical personnel again voiced the view that he had reached maximum hospital benefits and had the ability to function outside the Hospital. However, despite the wishes of G. Bradshaw that he be discharged from the Hospital, efforts to do so were blocked by threats from C. Bradshaw, that he better be confined and remain committed in a VA Hospital.

G. Bradshaw's progress was more than satisfactory from 1979–1981. G. Bradshaw continued to express a desire to be released from the VA Hospital. Since he was doing so well, VA medical personnel again recommended that he be released from hospital confinement. It was the opinion of the VA doctors that he had already reached maximum hospital benefits and was ready for hospital discharge. VA personnel felt he was a good candidate for consideration for community care placement since G. Bradshaw had financial resources coming to him.[6] This recommendation was accepted by the VA Hospital and G. Bradshaw was released from hospital commitment on May 22, 1981.

On May 22, 1981, G. Bradshaw was placed in a Residential Care Home in Los Animas, Colorado. This Home was not owned or operated by the VA. It was, however, approved and monitored by the VA. C. Bradshaw objected to this placement when it took place and demanded that G. Bradshaw be returned to the Fort Lyon Medical Facility or a comparable VA facility for hospitalization, treatment, care and confinement for the remainder of his life. From May 22, 1981, the VA has not incurred any expenses relating to G. Bradshaw's confinement since he was no longer a hospitalized patient at the VA Hospital. The VA has, however, continued to incur expenses for the outpatient medical care, treatment and services it provided G. Bradshaw subsequent to May 22, 1981. G. Bradshaw has not been required to reimburse the VA for these expenses.

Subsequent to February 1969, social security disability payments (checks) due G. Bradshaw were made payable to him monthly. C. Bradshaw was listed as his guardian "for other than social security purposes." While not clear from the materials before the court, it would appear that while the checks were in G. Bradshaw's name they were forwarded or sent to C.

He had "dysphasia with some perseveration" although he could communicate quite well despite the handicap. His powers of immediate recall were impaired, he was oriented to time but not to place, and he had some other limitations. However, VA medical personnel emphasized he did not require hospital confinement.

6. G. Bradshaw received considerable amounts of money from a lawsuit filed in connection with his 1969 automobile accident. At oral argument, plaintiff's counsel stated that this amount approximated $300,000. These funds were presumably under the control of C. Bradshaw, as the conservator of his estate, and were subject to accountings filed with the Superior Court of Maricopa County, Arizona. He also received social security payments which were also ultimately controlled by his wife until sometime prior to May 22, 1981, when, at G. Bradshaw's request, they were sent to and controlled by him.

Bradshaw's residence where she cashed them as conservator of his estate. C. Bradshaw states, by affidavit, that the proceeds of these checks were invested and were applied for G. Bradshaw's personal needs with all expenditures being accounted for in annual accountings filed with the Superior Court of Maricopa County, Arizona. At some time prior to May 22, 1981, G. Bradshaw, at his request, began to receive his checks at the VA Hospital. Said checks were no longer sent or forwarded to C. Bradshaw, as conservator. Subsequent to May 22, 1981, the checks due G. Bradshaw continued to be made out in his name, and were mailed to him at the Residential Home. An accounting of these proceeds was done by the VA. From his monthly check, G. Bradshaw paid for his room and board, retained a reasonable amount for personal spending and made deposits to a savings account set up for him.

From May 22, 1981, the VA has continued to monitor G. Bradshaw's welfare at the Residential Home. Many visits have been made to this Home by a Community Care Social Worker. G. Bradshaw, from May 22, 1981, and thereafter, continues to maintain a stable and adequate community adjustment, and no special incidents or problematic behaviors have been reported. He continues to handle his personal spending money without any problems.[7]

On January 12, 1984, an attorney for C. Bradshaw wrote the Medical Center Director at the VA Medical Center, Fort Lyon, Colorado, demanding, inter alia, that the VA "immediately return Glen Bradshaw to the Fort Lyon VA facility or to some similar facility in order that he may remain as a patient for the duration of his life without further charge, as agreed; ..."

7. From May 22, 1981, and thereafter, the VA continued to provide outpatient medical care, treatment, services and assistance to G. Bradshaw at the VA Medical Center at Fort Lyon, Colorado, as needed at no cost to G. Bradshaw or his estate. Counseling and social activities were equally available to him at a Veterans Administration Treatment Center at no cost to him. Services were also available to him at no cost through a VA community care program.

On May 11, 1984, the VA Deputy General Counsel responded to the above demand, in pertinent part, as follows:

At the request of Mr. George Beasley, our Denver VA District Counsel, we have reviewed your correspondence and other materials pertaining to the subject veteran and the circumstances surrounding the 1973 settlement of the claim for VA medical care costs as a result of his accident of February 23, 1969.

It is our opinion that Mr. Balamenti's letter of April 16, 1973, in no way constituted an agreement to hospitalize Mr. Bradshaw for the remainder of his life; only that, if he were to be hospitalized at a VA facility, it would be without charge. To interpret the letter to require the VA to hospitalize Mr. Bradshaw when his condition did not require hospitalization would be contrary to statutes governing eligibility for VA medical care and, further, against public policy since such a hospitalization could amount to false imprisonment.

We agree with Mr. Beasley's opinion, stated in his letter to you of January 30, 1984, that the necessity for inpatient medical care for Mr. Bradshaw is a medical decision, unaffected by the compromise of the claim for hospital charges in 1973.

Plaintiff's complaint was filed in this court on November 27, 1984.

### DISCUSSION

■ The court's task in the case at bar is to interpret and construe the April 16, 1973 agreement between the parties. Under this agreement, the parties first agreed to settle all hospital charges, "past, present, and future," incurred by G. Bradshaw in VA Hospitals and facilities as a result of his automobile accident on February 23, 1969, by payment to the VA of $15,000.[8]

Should G. Bradshaw require hospitalization at any time, the same would be provided him at a VA Hospital without cost to him or his wife.

8. There is no indication in the materials before the court what the VA's costs and expenses were in treating G. Bradshaw from February 28, 1969 to April 16, 1973. At oral argument, plaintiff's counsel stated these costs and expenses approximated $29,000.

The critical language of this agreement thereafter reads in pertinent part as follows: "... In consideration of said payment, Mr. Bradshaw will be entitled to remain as a patient at the VA Hospital, Fort Lyon, Colorado, or at some similar facility for the duration of his life without further charges."

Plaintiff requests an absolute, strict, and rigid interpretation of the above language. She argues that under this language, G. Bradshaw must be committed to hospital confinement for the remainder of his life. She proffers this interpretation despite medical and sociological determinations and assessments that G. Bradshaw had reached maximum hospital benefits, that he expressed a desire to be released from hospital confinement, that he demonstrated his ability to function fairly independently, that he was not a danger to himself or to others, and that while he would need a supervised, structured environment, there was no need, medical or otherwise, for him to continue to be committed or confined to the hospital. The above determinations and assessments are uncontested.[9]

Defendant, on the other hand, argues for a less strict and more flexible interpretation of the disputed language. Defendant argues for a reading that permits G. Bradshaw's release from hospital confinement upon medical determinations justifying the same. Defendant further states subsequent hospitalization(s) would be available to G. Bradshaw and/or his estate in VA Hospitals, as needed, without cost or charge. In reaching this interpretation, the Government focuses on the word "entitled" in the language at issue. It cites BLACK'S LAW DICTIONARY (5th ed. 1979), which defines "entitle", inter alia, as "to qualify for." Defendant maintains that G. Bradshaw is "entitled," i.e., qualified, to be a patient in a VA Hospital or similar facility, without charge, when he medically requires hospitalization.

In summary, plaintiff argues for an interpretation and construction of the disputed language that would justify G. Bradshaw's institutional commitment without further charge for the duration of his life regardless of medical or sociological considerations. Defendant argues for an interpretation and construction of the disputed language that would give consideration to medical and sociological considerations and hold G. Bradshaw entitled to, or qualified for, VA Hospitalization, without cost, when medically required, for the rest of his life.

The language in question, if construed literally as contended by plaintiff, would produce an absurd result. It would result in the confinement in a hospital for life of a person who, under medical and sociological determinations, should not be so confined. Confinement under such circumstances could easily be adjudged to violate the confined person's constitutional right to freedom. *See O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). An agreement to con-

---

**9.** Plaintiff's response to these determinations and assessments is that they are immaterial and irrelevant on the issues of the existence of the contract, its interpretation and its breach. The court views these records as material and relevant to the issue of the propriety of the continued hospital confinement of G. Bradshaw. Plaintiff has offered no counter documentation challenging the medical conclusions in these documents. Plaintiff had an opportunity to do so, because these records were attached to defendant's cross-motion for summary judgment. However, plaintiff's counsel did not attack the documentation, but simply advanced "mere assertions" regarding its evidentiary significance. *See Barmag Barmer Maschinenfabrik A.G. v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir.1984). *Barmag* suggests that "in countering a motion for summary judgment, more is required than mere assertions of counsel." *Id.* It

further states that the nonmoving party must detail in an affidavit ... what specific evidence could be presented at trial. *Id.* More importantly, there are times when a private agreement, however absolute and clear its language, will not be judicially enforced because the result the agreement seeks is unlawful, unconscionable, unreasonable or against public policy. *See Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (no judicial enforcement of restrictive covenant provisions in private agreement); *United States v. Acme Process Equip. Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) (contract unenforceable on public policy grounds—hostility to kickbacks, even though party seeking enforcement ostensibly appears entirely innocent). *See also Forest Envtl. Services Co., Inc. v. United States*, 5 Cl.Ct. 774, 777 (1984).

fine such an individual would most probably not pass judicial muster. Indeed, courts will not subscribe to an interpretation of contractual language which produces an absurd or whimsical result. *Valley View Shopping Center Ltd. v. United States,* 210 Ct.Cl. 89, 95, 535 F.2d 42, 46 (1976). It certainly should not be found to be a reasonable interpretation of an agreement. *See Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). One cannot suppose this to be the actual intent of the agreement. The reason of the law and common sense should prevail, in such circumstances, over the words of the agreement. Agreements, like statutes, should receive a sensible construction so as not to lead to injustice, oppression or unreasonable consequences.[10] *See Holy Trinity Church v. United States,* 143 U.S. 457, 459–461, 472, 12 S.Ct. 511, 512, 517, 36 L.Ed. 226 (1892). *See also Forest Envtl. Services Co., Inc. v. United States,* 5 Cl.Ct. 774, 777 (1984).

Money is at the heart of the dispute in this court. C. Bradshaw wants the VA to pay damages, which, she alleges, have accrued and will continue to accrue to her as conservator of G. Bradshaw's estate. She maintains that the damage payments have accrued and will continue to accrue from May 22, 1981, and thereafter until G. Brad-

shaw is returned to confinement in the VA Hospital at Fort Lyon, Colorado, or some other similar facility for the duration of his life without charge.

Plaintiff, in her complaint, seeks as relief "the award of money damages equivalent to the value of care and confinement in the Fort Lyon VA Hospital, or a similar facility" from May 22, 1981, into the future.[11]

Recognizing the harshness and oppressive nature of her position—that G. Bradshaw be institutionalized in a hospital for life—plaintiff plucks a second string attached to her liability bow in her reply brief. Plaintiff argues that the plain meaning of the April 16, 1973 agreement requires the VA to provide custodial care for G. Bradshaw without charge to him or his estate for the duration of his life. Plaintiff argues that the agreement can be interpreted to include the Residential Home Care Facility where G. Bradshaw has been residing since his release from hospital confinement on May 22, 1981.

■ Defendant responds to plaintiff's custodial care position, i.e., the VA's obligation to provide "housing" for G. Bradshaw without charge to him or his estate for the rest of his life, by pointing out that the VA had no statutory authority, and no funds accordingly had been provided by

---

**10.** One must not lose sight of the subject of this agreement, G. Bradshaw. He had expressed a desire, from 1976, to be released from hospital confinement. He was released in May 1981 and has, as far as this record is concerned, functioned independently and satisfactorily in an unconfined, nonhospital environment. He has some control over his life and is paying his own way with his own funds. There is no definitive evidence, by affidavit or otherwise, other than counsel's assertions that C. Bradshaw is in any way contributing any of her funds to assist G. Bradshaw.

**11.** In her moving brief, however, the damages plaintiff seeks are the sums of money equal to the daily rate for medical and psychiatric services at the Fort Lyon Medical Center from May 22, 1981 and thereafter. Since May 22, 1981, the VA has provided medical and psychiatric services on an outpatient basis to G. Bradshaw and the Government advises it will continue to do so. Neither G. Bradshaw nor his estate is charged for these services. Further, G. Bradshaw's room and board at the Residential Home

Care Facility have been paid out of his social security checks he receives each month. Spending money and savings also come from these checks. While damages are not before the court at this time, it would appear the VA has continued to provide G. Bradshaw with medical and psychiatric services. The only costs that G. Bradshaw ostensibly had to pay after his release from hospital confinement in May 1981 was his room and board expense for residential home care. In her reply brief, plaintiff alleges she had "to incur expenses for G. Bradshaw's daily care and housing, which by contract, were the obligation of the Government to provide." There is no support for this allegation. At oral argument, counsel for plaintiff stated that the damages sought are the residential home care payments including room and board, for the period May 22, 1981, to the present and into the future. As indicated earlier, G. Bradshaw paid for his room and board out of his checks. C. Bradshaw, in her affidavit, makes no mention of making room and board payments to the Residential Home Care Facility on behalf of G. Bradshaw at any time.

Congress, to provide "housing" or "custodial care" in a nongovernment facility to a veteran.[12] Accordingly, VA officials would be without authority to enter into an agreement that the VA would provide such housing or custodial care to G. Bradshaw without cost.[13] Since the VA officials lacked authority to enter into any such agreement for residential home care at the VA's expense, plaintiff's request that the court interpret the agreement to provide that the VA was obligated to pay for G. Bradshaw's housing in a residential home care facility must be rejected. It is established that a government official can only exercise such authority as has been given him or her. As a result, the Government is not bound by the unauthorized acts of its agents. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Strogoff v. United States,* 10 Cl.Ct. 584, 590 (1986). It is plaintiff's obligation to show that the VA officials had authority to enter into an agreement with plaintiff that if nongovernment residential home care were made available to G. Bradshaw, the VA would pay the cost and expense for same. *Id.* 10 Cl.Ct. at 590. This, plaintiff has failed to do. The risks in this regard lie with plaintiff. *Nat'l Bank of South Carolina v. United States,* 1 Cl.Ct. 33, 37, 553 F.Supp. 1064 (1982).

In short, plaintiff's interpretation of the April 16, 1973 agreement is unreasonable for reasons set forth above. Defendant's interpretation of said agreement is deemed reasonable under the totality of the circumstances.

■ Plaintiff has raised two other matters which require discussion. First, plaintiff stresses the fact that the Superior Court of Maricopa County, Arizona, found G. Bradshaw incompetent by Order of Commitment dated June 22, 1970 and committed him to a VA Hospital "until sufficiently restored to reason or otherwise discharged according to law." The VA, based on medical and sociological determinations, concluded in May 1981 that G. Bradshaw should be released from hospital confinement since he was, inter alia, able to function independently in a supervised, structured environment.[14] G. Bradshaw, since 1977, had expressed a desire to be released from hospital confinement. C. Bradshaw consistently and vigorously opposed any such release. Plaintiff did not, and does not, appropriately and properly contest the medical determination that G. Bradshaw had received maximum hospital benefits at the time of his release. Thus, it is clear that continued hospital confinement would have been of no benefit or assistance to him. Plaintiff does not contest the medical

**12.** The VA had statutory authority to furnish several types of care to veterans such as G. Bradshaw. *See* 38 U.S.C. § 610(a)(1), (b); 38 U.S.C. § 620(a)(1). In 1981, there was no statutory authority that the court is aware of, and none has been cited by the parties, for the VA to pay for housing or custodial care in community residential care facilities such as was utilized by G. Bradshaw from May 1981 to the present. In 1983, Congress specifically prohibited the VA from paying for community residential care of the kind on which G. Bradshaw was placed when he was released from hospital confinement in May 1981. *See* 38 U.S.C. § 630(b)(3) (Pub.L. No. 98–160, 97 Stat. 996 (1983)). This Act affirmed in a positive and direct way the fact that the VA was not authorized to pay for community residential care.

**13.** Defendant does not argue that the April 16, 1973 agreement is illegal, or that the VA officials lacked authority to make the agreement to settle the matter of the amount due the VA for providing medical services and hospitalization to a veteran for nonservice-connected injuries. All defendant contends is that the VA had no

authority in 1981 to pay for community residential home care for veterans with nonservice-connected injuries, if the agreement is construed as plaintiff claims. *See Nat'l Bank of South Carolina v. United States,* 1 Cl.Ct. 33, 37, 553 F.Supp. 1064 (1982).

**14.** The VA also indicated in its letter of May 11, 1984 to plaintiff's attorney that it was aware of the legal implications of confining a person who requests release and is capable of surviving safely in freedom by himself, with the help of a community program, or with the help of willing and responsible family members. *See O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Apropos plaintiff's argument regarding the Commitment Order of the Superior Court of Arizona, the Supreme Court stated in the *O'Connor* case, "[T]he fact that state law may have authorized confinement of the harmless mentally ill does not itself establish a constitutionally adequate purpose for the confinement." *Id.* at 574.

determination that he can function independently, a fact established by his activities and deportment prior to his release in May 1981, nor does plaintiff dispute the determination that he is not a danger to himself or others. Plaintiff does suggest that the VA determinations are self-serving, but this suggestion has no support other than counsel's assertions. There is a presumption that public officials act properly and conscientiously in the discharge of their duties, and it requires "well-nigh irrefragable proof" to establish the contrary. *Knotts v. United States*, 128 Ct.Cl. 489, 121 F.Supp. 630, 631 (1954); *Kalvar Corp., Inc. v. United States*, 211 Ct.Cl. 192, 198, 543 F.2d. 1298, 1301 (1976), *cert. denied* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). However, C. Bradshaw has insisted that G. Bradshaw be confined in the hospital, presumably in the mistaken belief that the Superior Court Commitment Order required that he be so confined. Any such presumption, however, would be in error. *See* n. 14, *supra.*

Plaintiff infers that the Superior Court Commitment Order of June 1, 1970 that G. Bradshaw was incompetent remained viable and controlling and could not be altered by the VA. This is not true. The Commitment Order, as indicated above, provided that confinement was ordered "until [G. Bradshaw be] sufficiently restored to reason or otherwise discharged according to law." The Arizona Mental Health Services Act provides that the authority to determine whether the continuation of court-ordered treatment is appropriate is vested in the chief officer of the VA, who has the same powers as the medical director of the health treatment agency of the state. Under this statute, the medical director must conduct this assessment annually. A.R.S. §§ 36–543 & 547.09 (1979). A person committed pursuant to a judicial determination may be released by the medical director of the treating agency, as the determination of treatment is a medical decision and *not* a

judicial one. *State ex rel. Dandoy v. Superior Court of County of Pima*, 127 Ariz. 184, 619 P.2d 12 (1980). The applicable state statute required that G. Bradshaw's competency be reassessed. The VA, legally entitled to do so, made an assessment. As a result of that reassessment it was medically established that hospital confinement was no longer necessary or required. Accordingly, plaintiff's argument relating to the Superior Court Commitment Order is without merit.

■ Second, plaintiff stresses the fact that the VA drafted the April 16, 1973 agreement.[15] From this fact plaintiff argues that any ambiguity, or susceptibility to more than one interpretation, must result in construction of the provision in question in favor of plaintiff. This is known in legal parlance as the *contra proferentem* rule. *See WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 876–877 (1963), *rehearing denied* Jan. 24, 1984. However, that rule should apply only where the construction or interpretation advocated is reasonable. *Petrofsky v. United States*, 203 Ct.Cl. 347, 359, 488 F.2d 1394, 1401 (1973). Plaintiff's construction and interpretation of the provision of the April 16, 1973 agreement in issue is not, under the totality of the circumstances, within the zone of reasonableness. Accordingly, her arguments in this regard are not persuasive. *See Solar Turbines Int'l v. United States*, 3 Cl.Ct. 489, 492 (1983).

■ Provisions of a contract must be construed so as to effectuate the spirit and purpose of the contract. *Thanet Corporation v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). The contract in question clearly was intended to benefit G. Bradshaw and to insure that he would be provided with medical care and services, as needed, throughout his lifetime. It was not intended to confine him to a lifetime of institutionalization, nor was it intended to restrict him from functioning independent-

---

**15.** It is interesting to note that plaintiff in her reply brief at p. 13, states that "the contract was the product of negotiations between the parties, through their counsel, with the parties free to include within the contract any and all provi-

sions they felt necessary to adequately express their complete understanding." So every word in the agreement, ostensibly, did not come from the Government's perspective, as argued by plaintiff.

ly, if he were able to do so, medically, financially and sociologically. Reasonably construed, the agreement was reasonably intended to provide a "crutch" that was to be always available to G. Bradshaw, if needed. It was not intended to provide a financial cushion for him for the rest of his life, unless he was unable to function independently from a financial, medical and sociological viewpoint. Such a construction of the agreement in question is not only reasonable but is supported by common sense and fairness to the one person whose welfare is, or should be, the paramount focus of the agreement. To the extent that the contract can be interpreted to call for the hospital confinement of G. Bradshaw for the rest of his life, regardless of medical determinations that he not be so confined, the contract would be unenforceable for public policy reasons and/or on constitutional grounds.

## CONCLUSION

In light of the above discussion, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. The clerk is directed to enter judgment dismissing the complaint. No costs.